**Jim David HUFFMAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69388.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 3, 1988.

Sam Ogan, Court appointed, Lubbock, for appellant.

Jim Bob Darnell, Dist. Atty., and Ruth Cantrell, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction of capital murder, V.T.C.A., Penal Code, § 19.03(a)(2), in which the death penalty was assessed by the court following affirmative answers by the jury to the two special issues submitted pursuant to Article 37.-071(b)(1) and (2), V.A.C.C.P.

Appellant raises eight points of error, two of which challenge the sufficiency of the evidence in some respect. One contends that the evidence fails to show that the murder was committed during the course of a robbery, and another contends the evidence is insufficient to support the jury's affirmative finding as to the issue of future dangerousness.

The record reflects that on February 14, 1984, the deceased, Jeanette Peters, age 48, lived alone in a trailer house on Space 242 in the Camelot Mobile Home Park in Lubbock. She was a LVN nurse who was on a leave of absence because of a back injury. Appellant, age 22, lived with Ann Young, age 31, in a trailer house on Space 239 in the same trailer park as Peters. Peters had befriended appellant and Young and frequently allowed them to use her telephone as they had none. It appears from the evidence that three or four days prior to February 14th Ann Young had taken her clothes and had gone to Stephenville.

Arthur Walsh Carnrick, Peters' Sunday School teacher, testified he talked to Peters between 7 and 7:30 p.m. on February 14th before he left Lubbock for Austin about a church choral group rehearsal which Peters organized, etc., that after his flight arrived in Austin he telephoned Peters between 10:30 and 11:30 p.m. but no one answered. The next morning he called again and became concerned when he still received no answer. He then telephoned Peters' sister, Betty Williams, about 8 a.m. on February 15, 1984. Williams testified she had talked with Peters several times on February 14th, the last time being about 8:15 p.m. and had planned to take Peters to the doctor at 9 a.m. on February 15th.[1] After Carnrick's call she immediately drove to Peters' trailer house, observed that Peters' car was missing, and was unable to get any response within the house by knocking and hollering. The door was locked. Williams drove to a store and called her husband and asked him to call the police. She later met Patrolman Bill Johnson at the trailer house. He had been there earlier, about 7:20 a.m., trying to locate the registered owner of a 1979 Chevrolet which had been involved in a police chase and a D.W.I. arrest and was thought to be stolen. Williams and Officer

1. Williams testified that earlier in the day the deceased Peters had stated she had made a mistake in letting appellant and his girlfriend use her phone so much. The girlfriend had gone to Stephenville and appellant was expecting a call from her at 3 p.m. and wanted Peters to be home when the call came in and Peters had other plans.

Johnson went to the rear of the trailer where Williams got a bedroom window open and saw her sister's nude body on the bed. Johnson then popped open the locked front door and went in and established that Peters was dead. Other officers were called. There was a tennis shoe sole imprint on Peters' face. The evidence reflects that Peters' television set, revolver, jewelry and other items were missing. Drawers had been emptied.

Dr. Alberto Gerdets, a pathologist, testified that he performed an autopsy at 1 p.m. on February 15, 1984, and in his opinion Peters had been dead 12 to 18 hours prior to that time. There were multiple contusions on her face and head and tennis shoe sole imprints on both sides of her face. There was a laceration of the right ventricle produced by pressure applied over the heart causing pressure between the spine and the heart. This could have been the cause of death, but in the doctor's opinion the cause of death was asphyxia due to manual strangulation of the neck.

Richard Carstensen, a student who lived at the trailer park, testified that late in the afternoon on February 14, 1984, he took appellant, at his request, to the Strip where appellant purchased a six pack of beer and a bottle of whiskey, and they returned to the trailer park about 7 p.m. He described appellant as being "down" as his girlfriend had gone to Stephenville to see her ex-husband.

Troy Bradshaw, age 16, lived with his father and Tanna Coleman in the trailer on Space 243 in the Camelot Park. He knew appellant, his girlfriend, and Peters, and knew appellant and Ann Young often used Peters' phone. Bradshaw testified appellant taught him how to kick and punch, and that he once saw appellant jump and kick the ceiling with his foot. Appellant also told him how a person could be killed by pressure to the heart through the chest.

Bradshaw revealed that on February 14, 1984, he went to work after school about 5:30 p.m. at Duff's restaurant, and that about 8:30 p.m. he received a telephone call from Ann Young, who had left four days earlier. She wanted Bradshaw to tell appellant she had left Stephenville and was in Graham and that she loved him. Bradshaw got off work about 10:30 p.m. and Richard Davis, a co-worker, took him home. As they were entering the gate to the trailer park, about 10:45 or 11 p.m., Bradshaw saw someone driving Peters' car out of the park. Bradshaw knew that the deceased Peters did not usually go out that late and didn't usually permit anyone to use her car. Davis testified that a man was driving the car they observed.

Bradshaw related that as soon as he got home he went to appellant's trailer to give him Ann Young's message. No one was home. Bradshaw then went to visit his friend, Shane, at another trailer. Twenty minutes later walking to his home Bradshaw saw Peters' car in appellant's driveway. He then saw appellant come out of his trailer and called to him from about 20 yards away. He observed that at the time appellant was wearing tennis shoes. Appellant ignored him and got into the deceased's car and drove out of the park without the car lights being on.

Lubbock Police Detective Aubrey Stark at 1 a.m. on February 15, 1984, observed a 1978 Chevrolet Malibu, license number RYZ 616, weaving from lane to lane and in a near collision with a concrete abutment. The vehicle sped away when he tried to stop it. He radioed for assistance and marked police vehicles responded and a wild chase ensued with the Chevrolet finally being driven onto the Fairgrounds parking lot hitting cement parking cones and going airborne. The Chevrolet finally stopped. As the officers were getting out of the marked units the Chevrolet was driven into both police vehicles and then finally came to a stop. Appellant was the driver of the Chevrolet shown by the evidence to belong to Peters, the deceased. He had to be pulled through a window as the car door could not be opened. Appellant was twice given the *Miranda* warnings. Stark described appellant as abusive, combative and intoxicated. He observed a television set in the back seat of the car. Other evidence showed that a Sears remote control selector, a revolver, watches, a checkbook, jew-

elry, sunglasses, etc., all belonging to Peters, were found in the car, as well as a coffee can of dirt and mud and some of appellant's clothes. There was also a partially filled Evans–Williams whiskey bottle.

Officer Terry Sansing, who helped to subdue appellant at the scene, described him as being six foot tall, weighing 180 pounds and as being "stout" in the upper chest and arms.

Appellant was taken to the intoxilizer room at the police department. There, while handcuffed, he bolted out of a chair, kicked Officer Richard Foster in the leg, and fell to the floor and suffered a laceration to his head. When Detective Stark first saw appellant at "the DWI room" he was screaming and thrashing about with a laceration over one eye. After he quieted down he was taken by ambulance to the Lubbock General Hospital about 1:45 or 2 a.m. Stark rode in the ambulance and related that appellant became violent again, kicking and screaming, but understood he was going to the hospital to have his cut treated. After arriving at the hospital, Stark stated appellant "stayed violent" and had to be restrained by leather cuffs on a gurney and was tied with sheets. Appellant still had on his tennis shoes. Stitches were taken on his forehead and then he was examined by Dr. Michael Paul Wenzler, a psychiatrist, sometime between 2 and 3 a.m. Dr. Wenzler testified that at first appellant was uncooperative, but his statements were short and coherent, that he asked to have his restraints loosened. He did not appear to be hallucinating, was not delusional, knew his name, was "oriented as to person," and appeared to understand what was going on around him. According to the doctor appellant's emotions were labile, quite changeable, from angry and struggling to tearfully repeating that no one loved him, and mentioning a girlfriend's name. He expressed a deep sense of sadness. The doctor ordered a blood test which showed "191 milligrams per decileter" or 0.19 percent of blood alcohol. Dr. Wenzler testified appellant was intoxicated, but he did not believe that the use of drugs was involved.

From the hospital appellant was taken to the Sheriff's office where a videotape was made, and appellant was placed in a padded cell at which time he became violent again, kicking, resisting and struggling.

It was shown that appellant's tennis shoes soles matched the prints on the deceased's face, and that blood on the shoes matched the blood of Peters with a high degree of reliability. The blood also matched that found in the trailer and could not have been that of appellant. It was stipulated that at 7 p.m. on February 14th appellant had called the telephone number at the house of Ann Young's grandmother in Stephenville and that the call had been placed from the telephone of the deceased Peters at her trailer house.

The State called Ann Young, who testified she met appellant in August 1983 and moved in with him in September, and in October they moved to the Camelot Trailer Park. Appellant worked and supported her and her two children, but in December she permitted her ex-husband to take the two girls to Stephenville. She described Peters as a loving and caring person, related she used Peters' phone nearly every day as she was looking for work. She left Lubbock on February 9, 1984, to go to Stephenville without a clear idea that she would be returning. She talked to appellant on February 11th and he told her he had sent her a Valentine. On February 14th she went to Graham where her brother lived seeking work. She called Duff's restaurant where appellant worked, but when she couldn't get him she called back and talked to Troy Bradshaw and gave him a message for appellant.

She admitted that sometimes when appellant got drunk that he hit her and once gave her a black eye. He later apologized after these attacks. She did recall that appellant told her he knew how to kill people, how "with his hands he could push in a heart."

After the jury found appellant guilty of capital murder, the State at the penalty stage put on record evidence of appellant's prior burglary conviction, and the testimony of a jailer (David Rowe) that on Febru-

ary 16, 1984, at about 4:30 p.m., some 27 hours after his arrest when appellant was being taken to court, he became violent,[2] charged out of his cell and attacked the jailer, ramming his back into the bars and began fighting and swinging, trying to get away, and it took six officers to subdue and handcuff him. The jailer testified that appellant was not intoxicated at the time. He did not believe, based on his experience, that appellant was coming down from a "big drunk" or from drugs. When appellant returned from court he was quiet, but additional security measures were taken thereafter when dealing with him. No further difficulty was experienced with appellant, but the jailer acknowledged alcohol was not available in the jail.

Appellant Huffman testified at the penalty stage of the trial that he was born April 21, 1961 in Arizona, and that he was 23 years old at the time of the trial. He related he was the product of a broken home, and he lived with his mother, grandmothers, uncles and aunts until the age of six years or so when his mother remarried. He then was sent to his father and stepmother in Oklahoma and stayed there until he was about 10 years old when he was returned to his mother, who, after six months, placed him in a foster home. He ran away from a foster home twice, and was then permitted to live with an aunt for eight months and an uncle for three months. Thereafter, when he was 12 or 13 years old, he returned to Oklahoma to live with his father. The family moved to Amarillo when he was 14 or 15 years old. At 17 years of age he was arrested for a burglary he committed with his brother. His probation was revoked because of another burglary and he was sentenced to the penitentiary for four years. He was paroled but the parole was later revoked. After serving three years and one month on the four year sentence he was paroled to Lubbock and a halfway house. Subsequently he met Ann Young and began living with her. They moved to the Camelot Trailer Park because the rent was cheaper. The appellant described the deceased, Pe-

ters, who lived there, as a good friend, who took them to the grocery store and helped him with income tax forms, and allowed them to use her telephone. He worked at various jobs, but in December when neither were working he and Ann decided to let Ann's ex-husband take the children. In February 1984 Ann began to miss the children and decided to go to Stephenville to visit them.

Appellant stated that he was depressed on February 14th about Ann's absence, and tried to contact her by telephone around 3 p.m. and got no answer. Shortly thereafter he got Carstensen, a neighbor, to take him to the Strip where he bought some beer and whiskey. After drinking some beer about 4 p.m. he rode his bicycle to the Town Draw where he purchased four hits of acid, "sorta like LSD," from a friend. He returned home, drank beer and about 6:45 p.m. went to Peters' trailer to use the phone. He talked to Ann's grandmother in Stephenville and got the impression Ann was not returning to Lubbock. He went home depressed and took all four hits of acid and then began to drink as much whiskey as he could. The next thing he remembered was waking up in the padded cell in the county jail.

On cross-examination he denied having a drinking problem, admitted that alcohol counseling was one of his burglary probationary conditions and that he did not attend any sessions. Appellant acknowledged he had assaulted Ann "probably twice" when he was drinking; that he had told Ann and Troy Bradshaw that he had heard in the penitentiary how you could kill someone, "You can push their nose, the bone in their nose, up through the brain. You could hit them hard enough in the chest to flood their heart. You can take little sharp objects and stick it up their nose." He denied telling them he could do that.

Dr. Richard Lee Ware, a clinical psychologist, testified he had examined appellant on July 20, 1984, and gave him certain psychological tests. He found appellant's overall verbal IQ to be 76, which was bor-

2. Deputy Rowe testified appellant kept shouting and asking where he was and why was he there.

derline, and found that his visual motor skills IQ to be 89 and that his full scale IQ to be 80. Dr. Ware felt appellant had adequate expression for a person functioning within that range, that appellant had adequate control for his feelings in his normal state, but had some feelings of inadequacy that he compensated for with bravado. Dr. Ware stated individuals like appellant often want to flee from strong confrontation and often escape into use of alcohol or drugs. He had learned the appellant began sniffing glue in the fifth grade and used "pot" while in the seventh grade and "pretty much anything he could get hold of" and that by the ninth grade he increased his alcohol and drug escape by using acid, heroin, cocaine, crystal "and that sort of thing." Dr. Ware, in his opinion, believed that from the acid and whiskey appellant could have suffered a "blackout," that it was possible to remember certain things even during a "blackout," and he concluded appellant would have guilt and remorse if he committed the offense. Dr. Ware did not testify as to future dangerousness.

The State offered rebuttal testimony that after his arrest appellant admitted he had stolen the car but that he would not say where he had taken the car or from whom.

■ Appellant contends the evidence was insufficient to prove the murder was committed "while in the course of committing the offense of robbery." He argues that murder plus theft does not equal capital murder as alleged; that while unexplained possession of recently stolen property may well give to an inference of theft, it does not give rise to an inference of murder committed in the course of a robbery. Appellant asks, "If a murder takes place and subsequent to the act, property is removed by the assailant, has a capital murder taken place? There is no evidence herein to show that was the case. Nor is there evidence to the contrary. The record is simply silent as to the events leading up to and surrounding the death of the victim."

We do not agree. It is enough even if the State proves that the robbery occurred immediately after the commission of the murder. *Lincecum v. State,* 736 S.W.2d 673 (Tex.Cr.App.1987); *Demouchette v. State,* 731 S.W.2d 75 (Tex.Cr.App.1986); *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr. App.1986); *Riles v. State,* 595 S.W.2d 858, 862 (Tex.Cr.App.1980).

There was ample evidence, albeit some was circumstantial, that a robbery occurred either during or after the commission of the murder. The victim was found dead, brutally beaten, with a number of items of property missing including her car. The property was found in the deceased's car being driven by appellant shortly after the death under the facts and circumstances shown. The test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Cr.App.1984) (Opinion on rehearing). This standard of review is the same whether the case involves direct or circumstantial evidence. *Houston,* supra, at 456.

The trial court properly charged the jury and we do not find that the appellant complains in this regard. We conclude that the jury's verdict is amply supported by the evidence. The point of error is overruled.

■ In another point of error appellant contends the trial court erred in overruling his motion for mistrial after the State inquired of Dr. Ware, the defense psychologist, at the penalty stage of the trial whether he knew that appellant had admitted stealing the victim's car.

To better understand the contention we must review what took place both before and after the mistrial motion was made. The evidence at the guilt stage reflected that appellant was arrested after a police chase while driving the deceased's car which contained a number of items taken from her home. At the penalty stage of the trial appellant testified that after he took four hits of acid and drank whiskey he didn't recall anything until he woke up in a padded cell. He didn't recall the chase, the

police department, hospital or jail. On cross-examination without objection he was asked:

"Q. Did you ever tell anybody or admit to anybody that Jeanette—that you had stolen Jeanette Peters' car?

"A. No, sir. I did not."

Dr. Ware, a psychologist, was a subsequent defense witness. On direct examination he stated that from his interview he formed the opinion that appellant had suffered a "blackout." On cross-examination Dr. Ware admitted he was not aware Dr. Wenzler, a psychiatrist, had examined appellant at the hospital on the night in question. In response to the prosecutor's questions Dr. Ware stated he was not surprised that Dr. Wenzler found that appellant made short statements which were coherent, knew his name, was not delusional nor hallucinating, etc. The record then reflects:

"Q. Would it surprise you to learn that in the early morning hours of February 15, 1984, that when he was asked if he had stolen the car that he replied yes to the police officers?

"A. No.

"MR. ALEXANDER (defense counsel): Your Honor, I am going to object because I don't believe there had been any testimony whatsoever that that occurred, and Mr. Darnell (D.A.) is interjecting facts that are not in evidence, and it is nothing but inflammatory and prejudicial, and we ask—

"THE COURT: Sustained."

Thereafter the court, upon request, instructed the jury to disregard, but denied the motion for mistrial then made. The witness was passed and no further questions were asked by the prosecutor. The defense rested. The district attorney announced he was calling Sgt. Ontiveroz in rebuttal, that the appellant had testified he didn't remember what happened that night and he was entitled to show the jury what statement the appellant had made about stealing the car. Appellant's counsel stated: "Object to it, it was custodial interrogation, no indication of Miranda warnings, no indication that he could understand the

Miranda warnings." The objection was overruled. Sgt. Ontiveroz was then called. He testified that he saw appellant in the intoxilizer room at the police department. The record reflects:

"Q. During the course of the questioning of Mr. Huffman about his being arrested for DWI, did you make an inquiry of him as to whether or not the car he was driving was stolen?

"A. Yes, sir, I did.

"Q. What was his reply?

"A. He replied that it was stolen."

Ontiveroz also testified appellant was crying and said that nobody loved him, "Just go ahead and kill me."

The State also called Officer Linda Ewing who related she was present and heard appellant tell Officer Ontiveroz he had stolen the car.

Returning to appellant's contention concerning Dr. Ware's interrogation, it is observed that the general rule is that error in asking an improper question "may be cured or rendered harmless by its withdrawal or an instruction to disregard." *Carter v. State*, 614 S.W.2d 821, 824 (Tex.Cr.App. 1981). The exception occurs in "extreme cases where ... the question ... is clearly calculated to inflame the minds of the jury and is of such a character so as to suggest the impermissibility of withdrawing the impression produced." *Carter*, supra, at 824–825. See also *Cavender v. State*, 547 S.W.2d 601 (Tex.Cr.App.1977).

Even if it can be argued the question to Dr. Ware was an improper one, the objection was sustained and the jury instructed to disregard and the interrogation was terminated. The inquiry then is whether the jury was so affected by the question that they were unable to disregard it in their deliberations as instructed. Appellant relies on *Ladd v. State*, 629 S.W.2d 139 (Tex. App.—Dallas 1982), for the proposition that a question which suggests that the defendant admitted guilt of a crime, where he had denied the crime at trial, is automatically so prejudicial that the jury cannot be expected to disregard the question. In *Ladd* the question, asked at the guilt stage of the trial, suggested that the defendant had

confessed to the very crime for which he was on trial. Here, the jury had already convicted appellant of the crime charged. The question was asked at the penalty stage about the theft of the car not the murder and was directed to a psychological witness on cross-examination. The facts and circumstances of the instant case are distinguishable from *Ladd.*

Appellant also relies upon *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr.App.1981), where it was observed that a jury might become incensed by what it believes to be the defendant's perjury during the penalty stage of the trial of a capital case. Appellant appears to suggest the improper question may have led to affirmative findings on the special issues (Article 37.071(b)(1) and (2), V.A.C.C.P.). The comment in *Garcia* was not necessary to the holding in that case and the facts are clearly distinguishable. Further, two officer witnesses testified in rebuttal to appellant's own testimony on the same subject matter at the penalty stage.

In light of the court's instruction to disregard and other circumstances, we conclude the general rule stated in *Carter* controls. The exception is not here applicable. See *Anderson v. State,* 717 S.W.2d 622 (Tex.Cr.App.1986); *East v. State,* 702 S.W.2d 606 (Tex.Cr.App.1985); *Bush v. State,* 697 S.W.2d 397 (Tex.Cr.App.1985); *Hudson v. State,* 675 S.W.2d 507 (Tex.Cr.App.1984); *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980); *Lovel v. State,* 538 S.W.2d 630, 632 (Tex.Cr.App.1976).

■ Appellant also complains that at the penalty stage of the trial the court erred in allowing the State to present evidence of an oral statement made by him while in custody as described above. He contends he was improperly impeached by Officers Ontiveroz and Ewing as to a statement about the victim's car being stolen. As earlier observed, appellant testified at the penalty stage of the trial. In *Cisneros v. State,* 692 S.W.2d 78, 83 (Tex.Cr.App.1985), this Court wrote:

"It is well established that a defendant who takes the stand as a witness on the trial on the merits may be cross-examined and impeached in the same manner as any other witnesses. McCormick and Ray, Texas Law of Evidence, Vol. I, Chapter 8, § 643, p. 487; 1 Branch's Ann. P.C., 2nd Ed., § 168, p. 170, and cases there cited; 62 Tex.Jur.2d, Witnesses, § 205, p. 130; *Shelton v. State,* 397 S.W. 2d 850 (Tex.Cr.App.1965); *Cerda v. State,* 33 Tex.Cr.R. 458, 26 S.W. 992 (1894). See also *Davis v. State,* 478 S.W.2d 958 (Tex.Cr.App.1972); *Dunlap v. State,* 440 S.W.2d 672 (Tex.Cr.App. 1969). Thus such a defendant may be contradicted, impeached, discredited, attacked, sustained, bolstered up, made to give evidence against himself, cross-examined as to new matter and treated in every respect as any other witness except when there are overriding constitutional and statutory provisions. *Taylor v. State,* 612 S.W.2d 566 (Tex.Cr.App. 1981); *Williams v. State,* 607 S.W.2d 577 (Tex.Cr.App.1980); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977); *Sensabaugh v. State,* 426 S.W.2d 224 (Tex.Cr. App.1968). See also *Valerio v. State,* 494 S.W.2d 892 (Tex.Cr.App.1973); *Black v. State,* 440 S.W.2d 668 (Tex.Cr.App. 1968); *Gonzales v. State,* 160 Tex.Cr.R. 548, 272 S.W.2d 524 (1954).

"Once the defendant testifies '[t]he interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' *Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). See also *Fitzpatrick v. United States,* 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900).

"Article 37.071(a), V.A.C.C.P., provides in part:

" '... In the proceeding, evidence may be presented as to *any matter* that the court deems *relevant to sentence.* This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States

or of the State of Texas.' (Emphasis supplied.)

Thus the trial court at the penalty stage of a capital murder trial has wide discretion in admitting or excluding evidence. *Smith v. State,* 683 S.W.2d 393 (Tex.Cr. App.1984); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984) and cases there cited. This discretion extends only to the question of relevance of the facts sought to be proved, and Article 37.071(a), supra, does not alter the rules of evidence insofar as the manner of proof is concerned. *Porter v. State,* 578 S.W.2d 742, 748 (Tex.Cr.App.1979); *Smith v. State,* supra."

Relying upon *Spann v. State,* 448 S.W. 2d 128 (Tex.Cr.App.1969), appellant takes the position that "incriminating statements made by an accused, while under arrest, which would not be admissible as original evidence, may not be used for impeachment." *Spann* at 129. However, much water passed under the bridge between *Spann* and the time of appellant's October 1984 trial. Article 38.22, V.A.C.C.P., was amended in 1977[3] and 1981[4] regarding the issue here involved. Section 5 of the statute under the 1977 amendment provided, inter alia, that nothing in the statute precluded the admission "of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law."

In *Alfaro v. State,* 638 S.W.2d 891 (Tex. Cr.App.1982), this Court was confronted with construing Article 38.22, V.A.C.C.P., as it existed prior to the 1981 amendments and resolving the apparent conflict between § 3 and § 5, quoted from above. Section 3 directly related to the admissibility of oral custodial statements for impeachment purposes upon the meeting of certain requirements. The *Alfaro* Court held that, as amended in 1977, § 3 controlled over § 5, and that an oral statement of a defendant resulting from custodial interrogation was admissible only for impeachment purposes when the statement met the specific requirements of § 3, and that § 5 applied to statements other than oral custodial statements made by the defendant.

Section 3 was amended in 1981. All references to the use of custodial statements for the purpose of impeachment were removed from that section. This in effect resolved the conflict between §§ 3 and 5 addressed in *Alfaro.* The 1981 amendment left only § 5 as applicable to the use of custodial statements for impeachment purposes. See *Roberts v. State,* 672 S.W.2d 570 (Tex.App.—Ft. Worth 1984); *Garrett v. State,* 682 S.W.2d 301, 305 (Tex.Cr.App. 1984).

It appears that by virtue of the 1981 amendments Article 38.22, supra, is now consistent with the federal constitutional rule of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In *Harris* the United States Supreme Court held that prior inconsistent custodial statements could be used to impeach the testimony of an accused even though the statements were inadmissible in the State's case-in-chief because of a failure to comply with *Miranda,*[5] as long as the evidence satisfied legal standards for trustworthiness.

In the instant case the prior inconsistent statements used for the purpose of impeachment of appellant stemmed from custodial interrogation, but after the giving of *Miranda* warnings rather than incomplete *Miranda* warnings as in *Harris.* Appellant does not contend that his statement was involuntary because of an overbearing of will, coercion or duress. See *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Appellant did not object on this ground and the record does not indicate that appellant's statements were involuntary under "traditional standards for evaluating voluntariness and trustwor-

---

**3.** Acts 1977, 65th Leg., p. 935, ch. 348, § 2, eff. Aug. 29, 1977.

**4.** Acts 1981, 67th Leg., p. 711, ch. 271, § 1, eff. Sept. 1, 1981, amending § 3 of the statute.

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

thiness." *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975).

In his point of error appellant does claim that the oral statements were made in custody "after requesting counsel." The oral statements in question were made while appellant was in the intoxilizer room at the police station. Appellant does not point to any portion of the record which supports his claim of a request for an attorney *at the time* and he has not briefed the contention. He did not object on this ground at trial. We have examined this voluminous record and find no support for such claim.[6] Since appellant's only claim of involuntariness seeks to raise the issue of invoking the right to counsel, it is denied. *Garrett v. State,* supra, at 307; *Oregon v. Hass,* supra.

The point of error is overruled.

■ In another point of error appellant urges the trial court erred in overruling his objection to the introduction of a videotape without a showing of a proper predicate.

The videotape was taken of appellant after his arrest at the county jail. When offered at the guilt stage of the trial the court sustained appellant's objection that a proper predicate had not been established for its introduction, but the court stated that it would admit the exhibit and permit its showing without sound (audio) as a silent film or series of photographs since the predicate for that action had been established, that witnesses had testified that the film accurately and correctly depicted appellant's appearance and demeanor at the time it was taken.

In *Edwards v. State,* 551 S.W.2d 731 (Tex.Cr.App.1977), this Court adopted a seven prong test for the admission of sound recordings. See also *Bates v. State,* 587 S.W.2d 121, 131 (Tex.Cr.App.1979); *Nacol v. State,* 590 S.W.2d 481 (Tex.Cr.

App.1979). In *Roy v. State,* 608 S.W.2d 645, 649 (Tex.Cr.App.1980), this Court noting that videotapes are a simultaneous audio and visual recording of events, adopted the *Edwards* predicate for the admission of videotapes, but added, "Moreover, because of the dual aspect of videotapes they convey a greater indicia of reliability than either film or sound tapes standing alone and *at least some of the Edwards elements may also be inferred from the testimony.*" (Emphasis supplied.)

Only recently in *Marras v. State,* 741 S.W.2d 395 (Tex.Cr.App.1987), this Court was faced with a contention similar to that advanced by the appellant. There this Court wrote:

"The videotape complained of herein has been reviewed by this Court and contains no audio portion, only video, i.e. motion pictures. Motion pictures are just a collection of photographs and the rules surrounding admission are the same as those for still photographs. *Housewright v. State,* [154 Tex.Cr.R. 101], 225 S.W.2d 417 (Tex.Cr.App.1949). Motion pictures are admissible when they are properly authenticated relevant to an issue, and not violative of the rules of evidence for the admissibility of photographs when a verbal description of a scene is admissible, a photograph or video recording of the scene would also be admissible. *Wilkerson v. State,* 726 S.W.2d 542, 547 (Tex.Cr.App.1986); see *Burdine v. State,* 719 S.W.2d 309, 316...." [7]

In *Williams v. State,* 461 S.W.2d 614, 616 (Tex.Cr.App.1970), this Court in discussing the proper predicate for the admission of motion pictures, quoted from Moses, *Scientific Proof in Criminal Cases —A Texas Lawyer's Guide, Sec. 10.04.*

---

6. The only reference to a request for counsel by appellant we have been able to find is a reference to the fact that in the audio portion of the videotape appellant made such a request during the taping. The audio was not played for the jury and is not in the appellate record. The record shows that the videotape was made at the Sheriff's office after appellant had been to

the intoxilizer room at the police station and the hospital.

7. In *Marras* the term "video" or "video recording" was used as referring only to the visual or film portion of an exhibit. Care should be taken in interpreting such language for, as recognized in *Roy,* videotapes are a simultaneous audio and visual recording of events.

"It is common knowledge that the predicate for the introduction of a photograph requires the proof of (1) its accuracy as a correct representation of the subject at a given time, and (2) its material relevance to a dispute issue ... all that is required of a witness who observed the object or scene depicted with his naked eye is testimony that the photograph truly and accurately represents that object or scene. Like still photographs, motion pictures are admissible in criminal prosecutions where they are properly authenticated, relevant to the issues and not violative of the rules established for the admissibility of photographs." See also *Cotlar v. State*, 558 S.W.2d 16 (Tex.Cr. App.1977), and *Housewright v. State*, [154 Tex.Cr.R. 101], 225 S.W.2d 417, 418 (Tex.Cr.App.1950).

"Before being admitted, photographic evidence must ordinarily be shown, either by direct proof or by admission to be correct. However, the only identification or authentication required is that the offered evidence properly represent the person, object or scene in question. This may be testified to not only by the photographer or a person photographed, but by any other witness who knows the facts, even though the witness did not take the photograph himself or see it taken." 36 Tex.Jur.3rd, Evidence, § 463, pp. 343–345.

"... and motion pictures are admissible in evidence under the same rules that govern the admission of ordinary photographs." 36 Tex.Jur.3rd, Evidence, § 462, pp. 340, 341.

Since the exhibit in the instant case was the visual portion of a videotape only, a silent motion picture, we conclude the rules relaying to admission of ordinary photographs are applicable. In view of the witnesses that testified the scenes depicted were true and accurate representatives of the scenes they witnessed, and since the same were relevant to the issues, we find no error in the admission of the exhibit.

Appellant relies upon *Delgado v. State*, 691 S.W.2d 722 (Tex.App.—San Antonio 1985) (no pet. history). There, as here, the trial court sustained the defense objection to the audio portion of the videotape and only the visual or "video" portion of the film was admitted into evidence. After noting *Edwards* and *Housewright* and citing some out-of-state cases, the Court wrote:

"Thus, the admissibility ultimately depends on the testimony of the operation of the video camera. The witness Sherman testified he videotaped appellant; that the videotape machine was operating properly; that the tape did not contain additions, deletions or changes; and that the tape clearly and accurately depicts the events during the videotaping of appellant. We find no reversible error and therefore overrule appellant's two points of error."

Undoubtedly *Delgado* reached the right result but applied to the admission of a videotape without sound, a stricter test than we apply in such cases. We do not deem *Delgado* as here controlling. Having read *Edwards*, the Court of Appeals may have overlooked the fact that with the deletion of the audio or sound portion of the videotape all that was admitted in *Delgado* was a silent motion picture. Appellant's contention is overruled.

Appellant next contends in his fifth point of error that the prejudicial effect of the videotape without sound outweighed its probative value and the admission thereof constituted "unfair prejudice," resulting in the court abusing its discretion.

■ In ruling on the admission or exclusion of photographic evidence, the trial court is accorded considerable discretion. 36 Tex.Jur.3rd, Evidence, § 461, p. 337. Further, we observe that in his point of error and argument thereunder appellant's contentions all based on relevancy and the fact that the exhibit introduction into evidence was "inflammatory, prejudicial and harmful" and that witnesses had already verbally described the scene in their testimony. We have examined the record and particularly the pages to which appellant directed our attention. We find no objection on these bases and nothing is presented for review.

Nevertheless, we find that the exhibit was admissible on the issue of demeanor after appellant's arrest. "If a verbal description of the material portrayed is admissible then a photograph reflecting the verbal testimony is also admissible." *Wilkerson v. State*, 726 S.W.2d 542, 547 (Tex.Cr.App.1986). The fact that witnesses may have testified as to a scene or events and are unimpeached does not prevent the introduction of photographs and motion pictures depicting the same scene or events. This does not constitute bolstering. *Marras v. State*, supra. In *Roy*, supra, we explained the "[a]ppellant's position that anytime there is a witness who testifies to a transaction, thereafter all additional evidence constitutes bolstering, would act to exclude the introduction of all tangible and scientific evidence, even when a proper predicate has been laid. This contention finds no support in the case law." *Roy*, 608 S.W.2d at 649. Appellant's contention is overruled.

Appellant also challenges the sufficiency of the evidence to sustain the jury's affirmative answer to Special Issue No. 2. "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), V.A.C.C.P.

It is well settled that in answering special issues under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the evidence admitted at the first or guilt stage of the bifurcated trial. *Beltran v. State*, 728 S.W.2d 382, 388 (Tex.Cr.App.1987); *Bridge v. State*, 726 S.W.2d 558, 569 (Tex.Cr.App.1986); *Santana v. State*, 714 S.W.2d 1, 8 (Tex.Cr.App.1986); *Bell v. State*, 707 S.W.2d 52 (Tex.Cr.App.1986); *Fierro v. State*, 706 S.W.2d 310, 319 (Tex.Cr.App.1986); *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1981), and cases there cited. See also *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App.1983); *Russell v. State*, 598 S.W.2d 238, 254 (Tex.Cr.App.1980). It has often been said that the circumstances of the offense, if severe enough, may alone be sufficient to support an affirmative answer to the second special issue under Article 37.071, supra. *Beltran v. State*, supra; *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986); *Fierro v. State*, supra; *Smith v. State*, 676 S.W.2d 379, 393 (Tex.Cr.App.1983); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App.1983); *Mitchell v. State*, 650 S.W.2d 801, 812 (Tex.Cr.App.1982).

The evidence at the guilt stage of the trial, as earlier described, showed murder committed in the course of robbery. The cause of death of the 48-year-old victim was asphyxia due to manual strangulation to the neck. Circumstantial evidence showed that appellant was the perpetrator. While highly intoxicated, appellant was observed in the victim's car. He led the police on a wild automobile chase, crashed or sideswiped two police vehicles in which officers were riding, resisted arrest, attacked another in the DWI room after the arrest. He continued to kick and scream and had to be restrained. The evidence showed that there was 0.19 per cent alcohol in appellant's blood by the time he reached the hospital.

In *Roney v. State*, 632 S.W.2d 598, 603 (Tex.Cr.App.1982), this Court wrote:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2d 464, 480 [Tex.Cr.App.1979], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose

of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State*, 522 S.W.2d 934 [Tex.Cr.App.1975]; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [1976]."

At the penalty stage of the trial the State offered record evidence of a prior burglary conviction, and the testimony of a jail guard that appellant, 27 hours after his arrest, asking where he was and why he was there, charged out of a cell and attacked the guard by ramming his back into bars and fighting. The guard acknowledged that thereafter appellant presented no further difficulty. The State, with the burden of proof, offered no psychiatric or lay opinions as to future dangerousness and presented no reputation testimony. Such testimony, of course, is not essential to an affirmative finding as to the issue of future dangerousness.

From appellant's testimony and that of Dr. Ware, the psychologist, we learn that appellant was 22 years of age at the time of the offense, had an overall IQ of 80, had come from a broken home, had been passed around to various family members during his formative years, and that on the date in question he had become depressed upon learning that his girlfriend was probably never going to return to him. He related that he took "four hits of acid" and then drank whiskey, that he blacked out and had no recollection of what happened until he awakened in a padded jail cell. Dr. Ware did testify that he learned the appellant had sniffed glue, used marihuana, and in the ninth grade was using LSD, heroin, cocaine, etc. Dr. Ware's testimony did not touch the issue of future dangerousness.

Appellant admitted he had been convicted of burglary at age 17, an offense he committed with his younger brother and in which only a clock was stolen. No violence was indicated in such offense or a subsequent burglary which resulted in the revocation of probation granted in the earlier burglary. His subsequent parole was revoked but the record is silent as to the reason therefor. Appellant testified he did not have any disciplinary problems while in the penitentiary, and this was not disputed by the State. There was no showing of violence in connection with appellant's prior criminal record.

At the guilt stage appellant's girlfriend testified that "sometimes" they would get into fights when appellant was drunk, that he would hit her with his palm, back of hand, but that she would hit back; that after it happened, appellant would apologize and sometimes cry. She did not know of him hurting anyone.

■ When deciding whether there was sufficient evidence to support a jury's finding that there is a probability the defendant will commit criminal acts of violence that will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.071(b)(2), V.A.C.C.P., beyond a reasonable doubt. See *Beltran v. State*, supra; *Santana v. State*, supra; *Fierro v. State*, supra.

"Prior criminal conduct, the age of the defendant and psychiatric evidence are among the various factors relevant in deciding the record punishment issue." *Roney v. State*, supra, at 661.

Psychiatric testimony, however, is not essential to support an affirmative finding to the issue of future dangerousness. *Beltran v. State*, supra, at 390; *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983); *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983). See also *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981).

Other factors relevant to the issue have been discussed in *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978). In *Robinson v. State*, 548 S.W.2d 63, 64 (Tex.Cr.App.1977), this Court wrote:

"This Court has stated that in determining the likelihood of whether or not a defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and the severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity but more than the emotions of the average man, however inflamed, could withstand." (Citations omitted.)

In order to determine whether the facts present in the instant case were sufficient we may look to other cases where the State failed to present sufficient evidence. We have, inter alia, examined the cases of *Roney v. State*, supra; *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982); *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981); *Brasfield v. State*, supra; *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978), as well as *Beltran v. State*, supra. No two cases are, of course, exactly alike.

According to the State's evidence the instant murder case was clearly senseless and unnecessary as most murders committed in the course of a robbery are. There was no showing that the robbery was long in planning or that murder or violence was originally intended. The appellant was highly intoxicated and emotionally distraught over his girlfriend. The violence shown at the time of appellant's arrest and the few hours thereafter was limited to that time period. Given the circumstances of the offense, as brutal and uncalled for as they were, we cannot say they were inherently sufficient to support the affirmative finding in question standing alone.

At the penalty stage of the trial neither side offered any psychiatric or reputation testimony, although the same was not essential or required. The prior criminal record of the appellant reflected no criminal acts of violence. There was the attack upon the jail guard 27 hours after appellant's arrest, when the guard did not believe that appellant was still intoxicated, but acknowledged that appellant was asking where he was. Thereafter, the appellant presented no disciplinary problem at jail nor does the record reflect any disciplinary problems while appellant was in the penitentiary. There was testimony offered by appellant that early on, while in school, he had used alcohol and various drugs, but after his confinement in the penitentiary there was no showing he continued to use drugs except on the date in question.

In order to support a "yes" answer to the issue of future dangerousness, the evidence must show beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Article 37.071(b)(2), supra; *Roney v. State*, supra at 603; *Beltran v. State*, supra at 390.

We find that in viewing the evidence as a whole from both stages of the bifurcated trial, and under the test described in *Beltran v. State*, supra; *Santana v. State*, supra; and *Fierro v. State*, supra, there is insufficient evidence to support the affirmative finding by the jury to the second special issue under Article 37.071(b)(2), supra. Therefore, we will reform the trial judgment to life imprisonment. See *Beltran v. State*, supra; *Wallace v. State*, supra; and *Roney v. State*, supra.

This holding affects only the death penalty and any other points of error relative to the jury's findings on the issue of punishment. As such, appellant's other points of error concerning errors at the penalty stage of the trial are moot. *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); *Beltran v. State*, supra, at 390.

The judgment, as reformed, is affirmed.

CLINTON, J., concurs.

W.C. DAVIS, CAMPBELL, WHITE and DUNCAN, JJ., dissent.