**Opinion filed February 5, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00222-CR
_____

## ARTHUR GALLEGOZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 15348-D**

### M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Arthur Gallegoz, of one count of murder and two counts of aggravated assault. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 22.02(a)(2) (West Supp. 2025). The jury assessed Appellant's punishment at thirty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice for the murder conviction, and eight years' imprisonment for each

aggravated-assault conviction. The trial court ordered that the sentences be served concurrently.

In a single issue, Appellant asserts that the trial court abused its discretion when it admitted a surveillance video of the murder that Appellant claims was not properly authenticated. We affirm.

## I. *Factual and Procedural Background*

Because the only issue in this appeal concerns the trial court's admission of the surveillance video of which Appellant complains, we will restrict our recitation of the facts to those that are relevant to this issue.

Derrick Compton lived in apartment no. 202 at the Claystone Apartments in Abilene. On February 1, 2022, his girlfriend (Catrina Messer), Paul John Delacruz (P.J.), and another friend were staying with him. That evening, Catrina parked her vehicle in the space that she knew was routinely used by the occupant of apartment no. 201; however, she believed that this person would not be returning to the apartment complex until sometime after midnight. Catrina testified that when they attempted to leave the complex, they noticed that a vehicle had parked in front of her vehicle, blocking it. She testified that while P.J. and Derrick asked the neighbor, Edward Minjarez, to move this vehicle, she returned to Derrick's apartment to use the restroom, and when she left the restroom, she could hear "mouthing" emanating from outside the apartment.

Appellant's uncle, sisters, and mother lived in other apartments in the complex, and Appellant would routinely stay with them. Appellant's sister, Serenity Gallegoz, testified that a confrontation ensued between P.J. and their uncle, Edward, over the parking space, and that P.J. was yelling at their group from the second-floor landing of the complex. Appellant testified that he overheard the banter, went to investigate, and subsequently intervened in the altercation that had begun between P.J. and Appellant's other sister, Destiny Gallegoz. Appellant testified that the three

of them were yelling at each other and challenging the other to fight. Appellant claimed that he heard P.J. shouting threats at Destiny, and after Appellant informed P.J. that Destiny was pregnant, P.J. responded that "he was going to shoot that b---h." Appellant stated that he tried to persuade Destiny to walk away, but P.J. threw a water bottle at them. Destiny then ran up the stairs after P.J.; Appellant, who testified that he believed that he needed to protect her, followed.

P.J. ran to his apartment, and Appellant and Destiny followed him to the front door of the apartment unit. There is conflicting testimony regarding the state of the front door when they got to the apartment. Catrina testified that P.J. entered the apartment and attempted to close the front door, but it remained open. According to Appellant, the door was open, and when he observed P.J. grab something from his waist and lift it, Appellant drew his handgun and fired it at P.J. to "scare him." Appellant testified that, as he was walking away, he could hear the door being pulled open and he saw a light. Believing that P.J. was returning to attack them, Appellant fired another round into the apartment before leaving the complex.

Although wounded, Catrina was able to call 9-1-1. Officers Quint Woody and Matt Clopton with the Abilene Police Department responded to the 9-1-1 call. Upon entering the apartment, the officers saw Derrick and Catrina on the floor. Officer Woody then cleared the apartment and found P.J. lying on the floor in a bedroom. Officer Woody testified that P.J. was staring at the ceiling with a fixed gaze and struggling to breathe, and as he observed the body, he noticed a gunshot wound in P.J.'s chest. Catrina also sustained gunshot wounds to her right arm and upper and lower abdomen. EMS later arrived and transported P.J., Catrina, and Derrick to the hospital.

The officers and detectives who investigated the scene found three bullet holes in the front door of Derrick's apartment and a bullet strike on the wall. A blood trail extended from the front door to the bedroom where P.J. was found, and five shell

casings were located outside the apartment, both on and in between the wood slats of the landing, and on the sidewalk below. No firearms were found inside the apartment. Investigators also noticed two surveillance cameras that were associated with apartment no. 201—one camera faced in the direction of Derrick's apartment, and the other faced the parking lot. They noted that the lights to the surveillance cameras were activated when they arrived at the scene, however, sometime later, the lights to these cameras were no longer on.

Sergeant Paul Martinez with the Abilene Police Department was assigned to the cyber unit at the time of the shooting, and the investigating detectives contacted him and requested his assistance with securing the security/surveillance cameras. After identifying Edward as the occupant of apartment no. 201, Sergeant Martinez questioned him about the status and conditions of the cameras. Edward indicated that the cameras did not work, and he showed Sergeant Martinez that the lines from the cameras that were inside his apartment were not plugged in. Nevertheless, Sergeant Martinez testified that he believed that the cameras were operational. Edward allowed Sergeant Martinez to collect one of the cameras and search his cell phone for an app that was linked to that camera, which was not located. Sergeant Martinez later researched this type of camera and found that the video footage from it needed to be stored on a physical storage device, and he shared his findings with the detectives on the case.

Edward's girlfriend, Sandra Pierce, lived with him in apartment no. 201. She testified that Edward had four or five cameras mounted inside and outside of the apartment. The two outside cameras pointed toward his vehicle in the parking lot and down the landing toward the neighbor's apartment. The other cameras were mounted inside. According to Sandra, the lines that powered the cameras were attached to a "box" inside the apartment. After the shooting, Edward called her, and

based on their conversation, she unplugged the lines that connected the cameras to the box and hid the box in a space under the water heater.

Because of Sergeant Martinez's discovery, law enforcement obtained a search warrant for apartment no. 201 where they believed the camera equipment was located. Edward initially denied the existence of a storage device for the cameras but later admitted that the storage device was hidden under the water heater. The officers, Detective Mike Scott, Edward, and Sandra watched the video footage from that night on the television in Edward's apartment, and Edward narrated the events as depicted on the video footage. The storage device was then seized by law enforcement and transported to the police station where it remained until trial.

At trial, Appellant's trial counsel objected to the admission of the surveillance video footage that was retrieved from Edward's camera, contending that Detective Scott did not properly authenticate it. Outside the presence of the jury, Detective Scott testified that: (1) the video footage was viewed by him in Edward's presence on a television in Edward's apartment; (2) Sandra had also viewed the video footage with the detectives; (3) the video footage that they viewed was time stamped; (4) the video storage device worked properly throughout their viewing of the video; (5) the time and date stamp on the video accurately depicted when the shooting occurred; and (6) the video had not been altered in any way after it was seized and taken into police custody. Despite Appellant's objection, the trial court admitted the video into evidence and granted Appellant a running objection each time the video was published to the jury.

The video footage had no audio. Detective Scott testified that the video footage showed Edward arriving at the complex at 11:07 p.m., and Appellant entering Edward's apartment several minutes later. Appellant, his brother, and Edward left Edward's apartment shortly before Destiny arrived at 11:23 p.m., and she met them in the parking lot. Detective Scott testified that the video footage

5

showed an exchange between P.J., Appellant, and Destiny that resulted in P.J. throwing a water bottle from the second-floor landing at Appellant and Destiny. Appellant and his sister then chased P.J., who ran to his apartment. Detective Scott testified that when Appellant and Destiny reached the partially opened door of the apartment, muzzle flashes can be seen. As Destiny attempted to pull Appellant away, the door cracked open, and Appellant returned and fired at least two more shots into the apartment. Destiny then ran toward her apartment, and Appellant left the complex with his brother.

There was also video footage from a camera inside apartment no. 201 that Detective Scott testified showed Sandra talking on a cell phone while looking out the apartment window at the detectives. She then began disassembling the lines that were connected to the hard drive, and the video ended.

## II. *Analysis*

In his sole issue, Appellant contends that the trial court erred when it admitted the surveillance video footage that depicted the shooting. Specifically, Appellant argues that the video footage was improperly admitted based on Detective Scott's testimony because: (1) Detective Scott did not witness the events depicted on the video and, therefore, could not verify that the video accurately represented the scene on that date and time; and (2) sufficient evidence was not presented that (a) the video equipment worked properly at the time the events were recorded and (b) the video equipment or video was neither modified nor tampered with before it was seized by law enforcement. He also asserts that the State's reliance on testimony that the occupants of apartment no. 201 (Edward and Sandra) never indicated that the video equipment had been tampered with or failed to function properly prior to its discovery by the police placed an improper duty upon them to share such information with law enforcement.

6

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 855 (Tex. App.—Eastland 2021, pet. ref'd) (citing *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019)). This standard of review also applies to a trial court's threshold determination of evidence authentication. *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015); *Hester v. State*, 590 S.W.3d 605, 611 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "We will not reverse a trial court's decision to admit or exclude evidence, and there is no abuse of discretion, unless that decision lies outside the zone of reasonable disagreement." *Barron v. State*, 630 S.W.3d 392, 410 (Tex. App.—Eastland 2021, pet. ref'd) (citing *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018)). Furthermore, we will uphold a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

Authentication is a condition precedent to the admission of evidence. *See* TEX. R. EVID. 901(a). To properly authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.*; *see Walter v. State*, 581 S.W.3d 957, 982 (Tex. App.—Eastland 2019, pet. ref'd). As reiterated by the Court of Criminal Appeals, it is within the jury's purview to "determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Fowler v. State*, 544 S.W.3d 844, 848–49 (Tex. Crim. App. 2018) (quoting *Butler*, 459 S.W.3d at 600); *see* TEX. R. EVID. 104(a); *Walter*, 581 S.W.3d at 982. This standard has been

7

characterized as a "liberal standard of admissibility." *Fowler*, 544 S.W.3d at 849 (quoting *Butler*, 459 S.W.3d at 600).

Evidence may be authenticated in several ways, including by the direct testimony of a witness with personal knowledge that the evidence is what it is claimed to be, the comparison of such evidence with other authenticated evidence, or by circumstantial evidence. TEX. R. EVID. 901(b)(1), (3), (4); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Authenticity may also be established with evidence of "[d]istinctive [c]haracteristics and the [l]ike," which include "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." TEX. R. EVID. 901(b)(4). "Video recordings without audio are treated as photographs and are properly authenticated when it can be proved that the images accurately represent the scene in question and are relevant to a disputed issue." *Fowler*, 544 S.W.3d at 849 (citing *Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim App. 1988) (concluding that the rules relating to the admission of ordinary photographs applied to an exhibit that was only a visual portion of a videotape)); *see also Garcia v. State*, No. 11-16-00347-CR, 2018 WL 6928986, at *4 (Tex. App.—Eastland Dec. 31, 2018, no pet.) (mem. op., not designated for publication) (citing *Gordon v. State*, 784 S.W.2d 410, 411 (Tex. Crim. App. 1990)).

Appellant contends that Detective Scott could not properly authenticate the video footage because he was not present when the events depicted on the video occurred. As previously noted, the critical inquiry for the authentication of video recordings that do not have accompanying audio is whether there is sufficient evidence to show that the video images accurately represent the scene in question. *Fowler*, 544 S.W.3d at 849 (citing *Huffman*, 746 S.W.2d at 222). In this regard, "the only identification or authentication required is that the offered evidence properly represent the person, object or scene in question." *Huffman*, 746 S.W.2d at 222.

8

Thus, to authenticate the video evidence offered by the State, it was not necessary for Detective Scott to have personally witnessed the events that were depicted in the video, and the absence of accompanying audio does not taint or invalidate his testimony provided he confirmed that the images in the video footage accurately depicted the scene that he observed, which it did. Further, Appellant and his sisters testified to and confirmed the events as depicted in the video.

Appellant also contends that Detective Scott's authentication testimony was flawed because he could not attest that the video equipment worked properly at the time the video recording was made or that the video equipment had not been tampered with prior to its discovery by law enforcement. In response to Appellant's assertions, the State relies on *Fowler*, where the court found that evidence from a similar circumstance to be properly authenticated. The State also argues that additional circumstances were shown to authenticate the video footage beyond those present in *Fowler*. We agree.

In *Fowler*, the trial court found that the State had adduced sufficient evidence, through the testimony of an officer, to support the authenticity of security camera footage obtained from a store. *Fowler*, 544 S.W.3d at 847. The court of appeals reversed the trial court's judgment and held that the video was not properly authenticated by the officer's testimony alone. *Id.* at 849. The court of appeals concluded that the State failed to adduce evidence that the video equipment and the date and time stamp functioned properly on the date of capture, or that the video accurately portrayed the events as they occurred that day. *Id.* The Court of Criminal Appeals disagreed and held that, although the most common method to authenticate evidence is through a witness with personal knowledge, it is not the only acceptable way to do so. *Id.*

As we have said, Rule 901 provides that such evidence can be supported by "[t]he appearance, contents, substance, internal patterns, or other distinctive

9

characteristics of the item, taken together with all the circumstances."  TEX. R. EVID. 901(b)(4).  The court in *Fowler* relied on additional circumstantial evidence to support the authenticity argument advanced by the State, including:

- the officer's in-person request for the manager of the Family Dollar store to retrieve the surveillance video for a certain date and time;

- the distinctive characteristic of a date and time stamp on the video;

-  the date and time on the video corresponded to the date and time on the receipt that was found within three feet of the stolen ATV;

- the video retrieved by the store manager showed that Fowler was at the store on the date and the time that the items listed on the receipt were purchased and that were found near the stolen ATV.

*Fowler*, 544 S.W.3d at 849–50.  Because of these circumstances, the court held that the trial court did not abuse its discretion when it admitted the video footage, even in the absence of authentication testimony from additional witnesses, because such a decision was within the zone of reasonable disagreement.  *Id.* at 850.

Here, Detective Scott testified that (1) the video equipment and the video itself functioned properly when it was first discovered in Edward's apartment, and (2) neither the video nor the video equipment had been tampered with after they were seized by law enforcement.  Detective Scott also referred to circumstantial evidence to support the authenticity of the video.  He testified that once Edward agreed to produce the video storage device, the detectives viewed the video footage with Edward and Sandra on a television in their apartment, and Edward narrated the events as shown on the video footage as they watched it in his apartment.[1]

This circumstantial evidence, coupled with Detective Scott's direct testimony concerning the video footage, the video equipment, and its condition from the time they were discovered until trial, supports the trial court's reasonable decision to

---

[1]Edward did not testify about the video's authenticity as he had passed away prior to the time of trial.

10

admit the surveillance video. *See Fowler*, 544 S.W.3d at 849–50. Accordingly, the trial court did not abuse its discretion when it found that Detective Scott's testimony sufficiently authenticated the video footage.

Appellant further contends that the State failed to prove that the video and the video equipment were not tampered with or altered prior to being seized and taken into police custody. The possibility that Appellant may be "the victim of some elaborate and ongoing conspiracy" by "unknown malefactors" is a question for the jury. *Tienda*, 358 S.W.3d at 645–46. Detective Scott's testimony was sufficient to make a prima facie showing of authenticity, and the jury had the discretion to consider the credibility of the video evidence after the trial court made its threshold determination of authenticity. *Id.* Accordingly, Appellant's contention that the trial court abused its discretion in finding sufficient evidence to support authenticity is unavailing.

Finally, Appellant argues that the State's reliance on Detective Scott's testimony that neither Edward nor Sandra indicated that the equipment failed to function properly suggests they had an affirmative duty to notify law enforcement of that fact. He asserts that such a duty would violate their Fifth Amendment right against self-incrimination because of their conversation with law enforcement officers regarding the possible consequences of tampering with evidence. While a person cannot be compelled to provide information that may be personally incriminating,[2] no such duty was placed on Edward or Sandra here. *See Salinas v. State*, 369 S.W.3d 176 (Tex. Crim. App. 2012) (holding that in pre-arrest, pre-*Miranda* circumstances, a suspect's interaction with police officers is not compelled). Additionally, the trial court was free to consider the additional

---

[2] U.S. Const. amend. V.

circumstantial evidence provided in its threshold authenticity determination. *See* TEX. R. EVID. 901(b)(4); *see also Fowler*, 544 S.W.3d at 849–50.

We conclude that the trial court did not abuse its discretion when it admitted the surveillance video because its threshold determination of authenticity fell within the zone of reasonable disagreement. *See Blake v. State*, No. 11-23-00165-CR, 2024 WL 3607930, at *4–6 (Tex. App.—Eastland Aug. 1, 2024, no pet.) (mem. op., not designated for publication) (The trial court did not abuse its discretion when it admitted authenticated video clips captured by a neighboring home surveillance camera that showed certain events connected to a murder and aggravated robbery.).

Accordingly, we overrule Appellant's sole issue.

### III.  *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


February 5, 2026

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.