

# IN THE
# TENTH COURT OF APPEALS

### No. 10-10-00165-CR

**SAUL CARRION REYES,**

Appellant

v.

**THE STATE OF TEXAS,**

Appellee

**From the 40th District Court
Ellis County, Texas
Trial Court No. 34079CR**

## MEMORANDUM  OPINION

A jury found Saul Carrion Reyes guilty of murder and assessed his punishment, enhanced by a prior felony conviction, at life imprisonment and a $10,000 fine.  This appeal ensued.  We will affirm.

### MOTION FOR INSTRUCTED VERDICT

We begin with Reyes's third issue in which he contends that the trial court erred in denying his motion for an instructed verdict.

A challenge to the denial of a motion for instructed verdict is actually a challenge to the sufficiency of the evidence. *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990). The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, No. AP-76,020, --- S.W.3d ---, ---, 2011 WL 4347044, at *16 (Tex. Crim. App. Sept. 14, 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and

can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

As limited by the indictment, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011).

The evidence viewed in the light most favorable to the verdict is as follows. On April 9, 2009, Reyes, also known as "Louie," was at a bar in Ferris, Texas, where he had a verbal confrontation with a member of the Scorpions Motorcycle Club. A physical altercation later ensued outside the bar, which left Reyes bleeding and his brother's windshield shattered. After the fight, Reyes was angry and upset and told a friend, "[I]t ain't over. . . . [T]hey'll get theirs."

On April 10, Reyes called Christy Holmes between 9:30 and 10:00 p.m. to talk about the fight at the bar. He told her that he and the Scorpions "got into it" at the bar and that "if he ever seen the Scorpions he would run them off the road." Reyes also spoke with Clint Shaw that night at about 10:30 or 11:00 p.m. outside the store located next to the bar where the altercation had occurred. Reyes seemed upset. He told Shaw that the Scorpions had hit him with a pistol and kicked him out. He also said, "[T]hey think they run that bar but they don't. Don't worry, I got something for them." Reyes then showed Shaw a gun. A man on a motorcycle then passed them, presumably headed toward the Scorpions' clubhouse. Reyes then said he had to go and quickly left the parking lot headed in the same direction as the motorcycle.

At about 8:00 a.m. the next morning, Henry Duran was on his way back home from town when he saw a motorcycle laying over in the yard of a residence. He said it "didn't look right," so he stopped. When he got out of his vehicle, he saw a body. Duran called for an ambulance and checked for a pulse, but there was no pulse, and the body was "[r]eal cold." Duran then knocked on the door of the residence. The people inside did not know that the body was in their yard. Duran thought the body looked like Mike who lived down the street from him. The body was later identified as Michael Wayne Owensby. Duran was aware that Owensby was a member of the Scorpions Motorcycle Club.[1] He was wearing a Scorpions vest and belt when he died.

Police initially worked the scene as a motorcycle accident. Owensby was dressed in several layers and there was very little blood, but when the medical examiner disrobed him, she found the gunshot wound to the neck that had killed him. She estimated the time of death at being within the twelve to twenty-four hours before the autopsy but said it could have been less. The case was referred to the Ellis County Sheriff's Department.

Reyes was developed as a suspect after investigators learned of the altercation between him and members of the Scorpions. An investigator confirmed that a call had been made on April 10 at 9:36 p.m. from Reyes's phone to the phone Christy Holmes used. Investigators located Reyes's abandoned vehicle in Mesquite, but there was no

---

[1] Owensby's girlfriend testified that he was a member of the Dallas chapter of the Scorpions Motorcycle Club, not the Ferris chapter with whom Reyes had fought.

evidence found in the vehicle regarding this case. An investigator also interviewed

Amanda Garcia, who worked at another bar near Ferris.

Garcia testified that she had met Reyes through her brother. Late on the night of

April 11, she saw Reyes at the bar where she worked. Reyes came over to talk to her.

She testified about the conversation as follows:

> Q. All right. Tell the jury how the conversation changed, what Louie said to you.
>
> A. Okay. We were sitting there talking and he started telling me about Thursday night, that he was at Wild Bill's and my brother had walked into the bar with a beer in his hand and someone had told him I think he couldn't walk in with a beer and asked him to throw it out.
> He went outside. Louie told me that he was called over to speak to one of the Scorpions. He went and sat next to him on a barstool and that guy told him that -- that he knew that Louie ran dope from the bar and that he did it, too. And that it was kind of like his territory for selling drugs. And that he didn't appreciate Louie coming in and, you know, doing it also.
> And he knew that he was doing it because every time Louie was there he would constantly see people coming in and out. And Louie just kind of told him, you know, well, what are you going to do about it? I don't know exactly what happened after that. I remember him telling me that he went outside and called some people. He told me his -- later on in the night -- that his brothers, Albert and Manuel, showed up and a friend and that they were out -- all outside I guess standing waiting for them.
> The Scorpions were looking out through a, I don't know, a window or something. It's like a wooden part of the bar. They were just standing out there and he told me that they came outside. And all I remember that he told me that they had a gun. One of them had a gun and that he -- they swung it at his head, hit him in his -- or they missed the first time and swung again, hit him in the back of the head and also broke one of his brothers' windshields. And then I guess they left and --
>
> Q. Did he seem upset or mad about that?
>
> A. Yes. He told me he was upset because they had a gun and they didn't use it.

Q. That make a lot of sense to you?

A. No.

Q. Okay. All right. What else did he say?

A. Well, he told me that -- he asked me if I had heard about this Scorpion getting killed and I told him yes. And he said that he -- that the cops were blaming him for it and that he was angry because the investigators went over to his house and were questioning his family and taking pictures of rooms in his house. And that they were just bugging his family and he was angry.

Q. Was he upset about that?

A. He was upset. And he told me that he -- that they were blaming him for this murder and that -- and then he just kind of got quiet. And then he looked at me and said, well, yeah, I did it. And I said you did what? And he said, I shot that guy.

Garcia stated that she had no idea why Reyes would tell her these things.

Reyes argues that, based on this evidence, the State has not proved the case beyond a reasonable doubt. He states in his brief, "We have the death of an individual, a person allegedly with motive, and no link other than the Appellant being in the same general vicinity and a questionable alleged confession given to a person with bias and motive to lie." Reyes argues that *Baugh v. State*, 776 S.W.2d 583 (Tex. Crim. App. 1989), and *King v. State*, 638 S.W.2d 903 (Tex. Crim. App. 1982), support his argument; however, these cases are distinguishable and were decided before the Court of Criminal Appeals discarded the alternative reasonable hypothesis construct. Reyes also argues that neither an accused's presence at, nor flight from, the scene of a crime is sufficient alone to support a guilty verdict. We agree with that general proposition, *see, e.g., Sosa v. State*, 177 S.W.3d 227, 230 (Tex. App.—Houston [1st Dist.] 2005, no pet.); however,

there is more evidence to support Reyes's conviction for murder than his mere presence and/or flight from the scene of the crime.

Here, Shaw testified that Reyes had made threats against the Scorpions, had shown him a revolver, and had hurriedly left to follow a motorcyclist the night of the murder. There was also testimony that the murder victim was wearing a Scorpions vest and belt when he was shot through the neck while riding his motorcycle a short distance from the location where Shaw had encountered Reyes on the night of the murder. Finally, Garcia testified that Reyes had confessed to her.

Reyes states that Garcia was biased and had a motive to lie, but the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). Here, by finding Reyes guilty, the jury obviously relied on the State's evidence and the reasonable inferences therefrom and rejected Reyes's argument. Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Reyes committed the offense of murder beyond a reasonable doubt. We overrule Reyes's third issue.

### EXCUSAL OF JUROR/REPLACEMENT WITH ALTERNATE

In his first issue, Reyes contends that the trial court erred in releasing Juror No. 10 during the trial and allowing the trial to proceed.

Before the attorneys were given time to exercise their peremptory challenges, the trial court indicated that they would be selecting two alternate jurors in addition to the jury. Each side was then allotted ten peremptory challenges and an additional "challenge of alternate." The State exercised all ten of its peremptory challenges and the "challenge of alternate." The defense exercised its ten peremptory strikes but not its "challenge of alternate." The jury was then seated, and the trial court announced the first and second alternate and told them that they needed to maintain their order. The jury was sworn by the trial court before the reading of the indictment and entry of Reyes's plea.

After the fourth witness had testified, the trial court informed the attorneys that Juror No. 10 felt like she could not continue because of back pain. The juror stated on the record, "I'm sorry. I've been trying, but I'm trying to get in every comfortable position I can, and it's just -- it's killing me." The trial court gave the juror another chair to sit in and attempted to continue the trial, but after a short time, the juror stated, "No, it's not going to work." The following exchange then occurred:

> THE COURT: All right. We've tried it with another chair or more comfortable chair and [Juror No. 10] reports that she's not going to be able to continue. I'm going to -- and you don't have any foreseeable idea of when you might be able to continue, I suppose?

> THE JUROR: It usually takes about three or four days to get out.

> THE COURT: Takes about three or four days. All right. So I'm going to declare the juror disabled and order the first alternate to take her place. Anything else you guys want to put on the record?

> [DEFENSE COUNSEL]: Your Honor, for the record, [Juror No. 10], I'm in great sympathy with you. I have to object, Your Honor, to the

Court's ruling allowing [Juror No. 10] to be released. I have no doubt about the legitimacy of her pain. However, it compromises the jury that we worked pretty diligently to select. I believe that I'm required and should object and request that the Court reconsider so that the original jury be allowed to proceed.

THE COURT: All right.

[PROSECUTOR]: Your Honor, may I ask [Juror No. 10] a question?

THE COURT: Yes.

[PROSECUTOR]: [Juror No. 10], do you feel like the amount of pain that you're having will make it hard for you to listen to the evidence, that you'll be distracted by your pain and not able to pay attention to the evidence and fully give your attention to these matters?

THE JUROR: Yes. It's making me nauseated and everything the pain is so bad in my back.

THE COURT: All right. Well, beyond that, I think it's more a physical thing that the juror is unable to continue. Holding this jury together for another three or four days with the possibility that this juror may recover will just cause additional problems with other jurors and other possibilities of other problems with jurors' families. And the Court so rules the juror is disabled and excused.

Reyes first complains that the trial court erred because the record does not reflect that the alternate juror was ever properly sworn. But Rule 44.2(c)(2) of the rules of appellate procedure mandates that unless it was disputed in the trial court, or unless the record affirmatively shows the contrary, we must presume that the jury was properly impaneled and sworn. TEX. R. APP. P. 44.2(c)(2); *see Osteen v. State*, 642 S.W.2d 169, 171 (Tex. Crim. App. 1982). Here, Reyes did not object in the trial court that the alternate juror was not properly sworn. Furthermore, nothing in the record affirmatively shows that the alternate jurors were not sworn in with the rest of the jury.

We will thus presume that the alternate juror was properly sworn. *See* TEX. R. APP. P. 44.2(c)(2).

Reyes also complains that the trial court erred in excusing Juror No. 10 and allowing the trial to proceed because, "[b]y removing a vital part of the original twelve jurors, the Court allowed a breach of the sanctity of the jury chosen to try this case." We disagree.

"[A]fter the trial of any felony case begins and a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict." TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (West Supp. 2010). However, if alternate jurors have been selected, they, in the order in which they were called, shall replace a juror who is found to be unable or disqualified to perform his or her duties. *Id.* art. 33.011 (West Supp. 2010). A juror is disabled only when he or she is physically, emotionally, or mentally impaired in some way that hinders the juror's ability to perform his or her duty as a juror. *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999). The determination as to whether a juror is disabled is within the discretion of the trial court. *Id.*

Here, Juror No. 10 stated that the pain in her back was "killing" her and making her nauseated. She also answered affirmatively when asked whether the pain would make it hard for her to listen to the evidence, distract her, and make her unable to pay attention to the evidence and fully give her attention to these matters. Thus, the trial court did not abuse its discretion in determining that Juror No. 10 was disabled.

Furthermore, once Juror No. 10 was determined to be disabled and excused, the trial court did not err in replacing her with the first alternate and allowing the trial to proceed. *See* TEX. CODE CRIM. PROC. ANN. art. 33.011. We overrule Reyes's first issue.

**ADMISSION OF EXHIBITS**

In his second issue, Reyes contends that the trial court erred in overruling his objections to the introduction of State's Exhibits 18, 19, 20, and 21 because verification of the accuracy and fairness of the photographs had not taken place. We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Kelley v. State*, 22 S.W.3d 642, 644 (Tex. App.—Waco 2000, pet. ref'd).

Photographs are authenticated by the testimony of any witness who has personal knowledge that the particular items accurately represent the scene or event which the photographs purport to portray. TEX. R. EVID. 901. There is no requirement that the witness took the photo, saw it taken, or was present when it was taken. *Hughes v. State*, 878 S.W.2d 142, 155 (Tex. Crim. App. 1992) (citing *DeLuna v. State*, 711 S.W.2d 44, 46 (Tex. Crim. App. 1986)). Any witness who observed the object or the scene depicted in the photograph may lay the predicate. *Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988).

Ellis County Sheriff's Department investigator Phillip Slaughter testified that State's Exhibits 18, 19, 20, and 21 were aerial photographs of the area roadways, the bar, and the residence where Owensby's body was found. Although he acknowledged that he did not take the photographs, Slaughter stated that the photographs were fair and accurate representations of the scenes that they depicted. We thus conclude that the

trial court did not abuse its discretion in overruling Reyes's objection and admitting State's Exhibits 18, 19, 20, and 21.  *See* TEX. R. EVID. 901; *Hughes*, 878 S.W.2d at 155.

In addition to arguing that the exhibits were not properly authenticated, Reyes also appears to argue in his second issue that the exhibits were improperly admitted because their probative value was outweighed by the "inflammatory" and "harmful" nature of the photographs.  However, Reyes did not make such an objection in the trial court; therefore, his complaint has not been preserved for review.  *See* TEX. R. APP. P. 33.1(a).  We overrule Reyes's second issue.

Having overruled all of Reyes's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed November 30, 2011
Do not publish
[CRPM]