In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00081-CR
_____

TRENARD JERMAINE SMITH, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 16-10-12268-CR

MEMORANDUM OPINION

A grand jury indicted Trenard Jermaine Smith for the offense of engaging in organized criminal activity. *See* Tex. Penal Code Ann. § 71.02 (West Supp. 2017). After pleading not guilty, Smith was convicted by a jury, and the jury assessed punishment at two years' confinement in state jail and a fine of $10,000. Smith raises three issues on appeal, challenging the admission of a statement by a co-defendant and of a surveillance video, and alleging ineffective assistance of counsel. We affirm the judgment of conviction as reformed.

1

Evidence at Trial

Testimony of K.V.[1]

K.V. testified that, on October 6, 2016, she went to Walgreens after having gone through the commercial drive-through window at the bank. She recalled being inside the Walgreens store for "maybe 5 to 7 minutes[.]" When she got back to her car, she heard a crackling sound when she slammed the car door, and she observed her back window was shattered and glass was in the seat of the car. She went back into Walgreens to see if the store had surveillance video so she could see what happened, and the store manager said he could not show her the video until the police had arrived. Upon returning to her car, she discovered her purse and a bank bag were missing. After the police arrived, she gave them a statement. K.V. testified that she did not know the defendant and she did not give him consent to enter her vehicle.

Testimony of S.F.

S.F. testified that, on October 6, 2016, she went to a Walgreens in New Caney to pick up a prescription for her son. At the Walgreens, she noticed a vehicle "parked at an angle that looked odd." When she passed it, she noticed another car was being

---

[1] We use initials herein to identify the victim and civilian witnesses. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

broken into: there was broken glass, and she saw a person reach into the broken car window and then pull something out of the vehicle through the broken window. Then S.F. saw the person return to the other vehicle that was parked at an odd angle. S.F. explained that she decided to get the license number of the vehicle that was parked at an odd angle (hereinafter the "suspects' vehicle") and she took a photo of the suspects' vehicle with her cell phone. The photo of the vehicle was entered into evidence as State's Exhibit 10. S.F. testified that she believed at some point the suspects had noticed her. S.F. followed the suspects' vehicle and as she followed the suspects' vehicle picked up speed. S.F. observed the suspects driving erratically and cutting in and out of traffic. She believed they were trying to get away from her, and she called 911. S.F. reported to 911 that she had witnessed a robbery and a vehicle being broken into, and that she was following the suspects as they were trying to get away. Ultimately, S.F. observed the suspects enter Highway 59, traveling at a high rate of speed.

S.F. testified that she followed the vehicle for approximately five or six miles. While on the phone with 911 and following the suspects, S.F. told 911 that they were near a police station, and when she passed a parked police vehicle, she flashed her lights and pointed in front of her. S.F. explained that the police car stayed on the feeder road, and after the suspects' vehicle exited, the suspects hit something when

3

they tried to make a U-turn. After the suspects crashed, S.F. observed a passenger getting out and running into a wooded area, and she saw another person next to the wrecked vehicle. S.F. testified that she took a photo of the wrecked vehicle, which was admitted as State's Exhibit 13. S.F. also testified that she had viewed the content of State's Exhibit 11, a surveillance video from Walgreens, and she agreed it accurately reflects the scene as she saw it on the day of the incident. The portion of State's Exhibit 11 that S.F. had personally viewed was admitted into evidence.

Testimony of Trooper Jordan Wilson

Jordan Wilson, a trooper with the Texas Department of Public Safety, testified that on October 6, 2016, he received a call regarding a vehicle involved in a possible burglary that had crashed after traveling northbound on Highway 59 at a high rate of speed. Wilson identified State's Exhibit 14 as a photo of the crashed vehicle that was involved in the chase. Based on his experience and training, Wilson concluded that the vehicle had been traveling at a high rate of speed when it crashed. The trooper testified that the wrecked vehicle was a rental that had "aftermarket tint thrown on." Wilson also identified the photo in State's Exhibit 15 as depicting a stolen purse he removed from the wrecked vehicle. He identified the purse from his conversation with an officer at the Walgreens who had spoken with the victim.

4

Wilson testified that, in his experience, automobile burglaries such as this one are sometimes committed by persons who are linked to Houston.

Testimony of Sergeant Terry Barnhill

Sergeant Terry Barnhill, a DPS Sergeant assigned to the New Caney Highway Patrol office, testified that on October 6, 2016, he heard a call regarding a crash involving "suspected robbers[,]" and he went to the scene of the crash. Barnhill testified that the vehicle had crashed into a pillar under an overpass, and in his opinion, the vehicle had been traveling fast. Barnhill explained that the vehicle was a rental with window tinting that had been put on "really fast to cover up the windshield." According to Barnhill, the air bags were deployed and one of the license plates was inside the vehicle.

Barnhill explained that other law enforcement officers on the scene had apprehended two people that were in the vehicle, and he assisted in collecting evidence, photographing the scene, and inventorying the vehicle. Barnhill identified State's Exhibits 16 through 27 as photographs he took as he was conducting an inventory of the vehicle, and he agreed they were accurate depictions. Barnhill identified the object depicted in State's Exhibit 24 as a springloaded window punch, which he explained is used to break car windows or windshields and is commonly used in vehicle burglaries because it is a quick way to get into a vehicle without

5

setting off the alarm. According to Barnhill, the initial report described suspects targeting people at banks, and inside the vehicle was a bag with a bank logo, which he identified in the photo in State's Exhibit 23. Barnhill testified that he has seen an increase in burglary cases in the past few years involving perpetrators coming into Montgomery County from Houston.

Testimony of Deputy Colton Bird

Deputy Colton Bird, a patrol deputy with the sheriff's office, testified that on October 6, 2016, he was dispatched to the scene of a burglary of a motor vehicle at a Walgreens on Road 1485 in New Caney, where a woman's vehicle had been broken into and her purse had been stolen. Bird identified State's Exhibits 9 through 35 as photographs taken at the scene, and he agreed they were accurate depictions of the victim's vehicle showing the rear passenger window broken and debris of broken glass on the ground, the front side passenger window with two marks that reflected other failed attempts to break the window, the rear passenger side with broken glass on the seat inside the victim's vehicle, the victim's purse and items in the victim's purse that had been recovered, including her identification and a bank bag. Bird agreed that he transported Smith from the hospital to jail after the offense.

Bird further explained:

> I was initially dispatched to Walgreens where I met with [K.V.]. I went inside and I spoke with the manager of Walgreens and asked if

6

> I could view the security footage from the store. They had a camera on the corner of the store that pointed in the direction where her vehicle was parked. And I observed that footage with the manager in the back room.

Bird testified that he obtained a copy of the surveillance video from the Walgreens store manager on the day of the offense after observing the recording of the offense from the recording equipment, and he agreed that, based on his knowledge of the Walgreens parking lot and what he observed, the video recording accurately reflected the Walgreens parking lot. About twenty minutes of the video was published to the jury. Bird agreed that the video depicted a parked vehicle that did not move and from which no one entered or exited for a period of about fifteen minutes, that Chase Bank was visible across the street, and the parked vehicle was "pointed looking at the bank[.]" Bird identified the victim's vehicle in the video as it was leaving the Chase Bank parking lot.

Testimony of Deputy Ryan Jones

Deputy Ryan Jones with the Montgomery County Sheriff's Office Gang Intelligence Unit (GIU) testified that he assists as an investigator on gang offenses. Jones explained that the goal of the GIU is to "disrupt and dismantle all gangs in Montgomery County[,]" which includes documentation of gang membership in a statewide database known as "TxGang." Jones explained that various factors indicate to him that someone is a gang member: a judicial finding, self-identification,

7

a reliable or corroborated informant, dress, hand signs, tattoos, internet recruitment, or use of gang colors. According to Jones, only three indicators are stand-alone criteria: a judicial finding, self-identification, or a corroborated informant. Jones explained that the gang known as "Bloods" is associated with the color red, tends to prefer certain tattoos and symbols, and commonly uses certain hand signs. Jones testified that Bloods' tattoos often depict a five-point star, red ink, paw prints, bricks, flames, or the letter B, and that sometimes Bloods' members alter the logo of local sports teams to conform to the gang.

Jones testified that he was called to the scene in this offense and that he also went to the hospital because the suspects had fled, wrecked their vehicle, and required medical attention. Jones explained that he spoke with Shawn Raney, Smith's co-defendant, at the hospital and ultimately documented Raney as a member of the Bloods based on Raney's self-admission and his tattoos. Jones also later identified Raney in some Facebook photos in which he was wearing the color red and displaying a Bloods' hand sign. Jones also explained that he found a Facebook photo of Raney and Smith together displaying a Bloods' hand sign. According to Jones, photos of Smith found on Facebook show him wearing red clothing and shoes and displaying Bloods' hand signs. State's Exhibits 39 through 45 were entered into evidence, which Jones explained were photographs of Smith taken at the

8

Montgomery County jail and depict Smith's tattoos. Jones testified that he relied in part upon Smith's tattoos in documenting Smith as a member of the Bloods, and he explained that three tattoos he observed on Smith in the hospital were "clear indicators" of gang membership. According to Jones, the tattoos included various features associated with the Bloods, including flames, a paw print, the letter B, red ink, a symbol for the Houston Rockets shaped into the letter B, certain phrases associated with the Bloods, and an image of Benjamin Franklin commonly used by Bloods. Outside the presence of the jury, Smith showed his tattoos to the trial court judge, and she was satisfied that the photos represented the tattoos adequately. At trial, Jones identified an additional tattoo on Smith of a red paw print. Based on his experience and training, Jones concluded that Smith belongs to a criminal street gang known as the Bloods, and Jones had no doubt in his mind that Smith met the State criteria for being entered into the TxGang system as a member of a gang.

Jones testified that law enforcement has observed that certain offenses committed by gangs are offenses that require "man power[,]" surveillance, or "scoping out a place[,]" such as burglaries of motor vehicles, robberies, and bank jugging. Jones explained that "bank jugging" is a criminal scenario in which

> . . . multiple people will watch someone at a bank and when that person withdraws some money from a bank, they'll follow the person to another location to where they stop and get out of their car. Sometimes it's Wal-Mart or another [] store.

9

Once they see the person leave their vehicle, at that point they'll approach, they'll smash the window of the vehicle or unlock the car if someone happens to leave it unlock[ed] and they'll take -- they'll withdraw amounts.

Based on his experience and training, Jones agreed that gang members from known gang areas in Harris County come into Montgomery County to commit crimes, including "jugging."

The jury found Smith guilty of engaging in organized criminal activity as charged in the indictment and assessed punishment at two years' confinement in state jail and a $10,000 fine. Smith timely appealed.

Standard of Review

We review a trial court's admission of evidence for abuse of discretion. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.* We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *See De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Where the alleged error is not constitutional, we will reverse the trial court's judgment only if the error affected the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *See Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Substantial rights

10

are not affected by the erroneous admission of evidence if, after examining the record as a whole, the appellate court has fair assurance that the error either did not influence the jury or had only a slight effect. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Admission of Co-Defendant's Statement

In his first issue, Smith argues that the trial court erred by admitting Shawn Raney's out-of-court statement that Raney was a gang member. According to Appellant, the statement was an out-of-court testimonial statement, the admission of which violated Appellant's rights under the Confrontation Clause.

The Sixth Amendment's Confrontation Clause bars the admission of testimonial statements of a witness who does not appear at trial unless that witness is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 42, 59 (2004); *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005). The threshold inquiry for a Confrontation Clause violation is whether the admitted statements are testimonial in nature. *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008); *see also Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (concluding, in reviewing Confrontation Clause challenge, appellate courts must "first determine whether the Confrontation Clause is implicated[,]" that is, whether out-of-court statement made by witness

11

absent from trial and testimonial in nature). The Sixth Amendment does not bar the use of nontestimonial hearsay. *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011); *Infante v. State*, 404 S.W.3d 656, 664 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Whether a statement is testimonial is a constitutional legal question that we review de novo. *See Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). Testimonial statements are typically solemn declarations made for the purpose of establishing some fact. *Crawford*, 541 U.S. at 51; *Russeau*, 171 S.W.3d at 880. This typically occurs "when the surrounding circumstances objectively indicate that the primary purpose of the [communication] is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").

Any Confrontation Clause error is of Constitutional dimension and subject to a harm analysis. *Langham*, 305 S.W.3d at 582. When the error in question is constitutional, an appellate court must reverse a judgment of conviction or

12

punishment unless the court determines beyond a reasonable doubt that the error did not "move[] the jury from a state of non-persuasion to one of persuasion on a particular issue." *Id.* (quoting *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)); *see also* Tex. R. App. P. 44.2(a). In applying the "harmless error" test, we ask whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). Our analysis seeks to calculate the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We consider such things as the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. *See Snowden v. State*, 353 S.W.3d 815, 821-22 (Tex. Crim. App. 2011). We evaluate the entire record in a neutral manner and not in the light most favorable to the prosecution. *See Cantu v. State*, 395 S.W.3d 202, 211 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

The State argued to the trial court and argues on appeal that the statement at issue here is nontestimonial. The State principally relies upon *Cantu v. State*, 339 S.W.3d 688 (Tex. App.—Fort Worth 2011, no pet.). In *Cantu*, the Fort Worth Court of Appeals considered out-of-court statements made by the defendant and an associate wherein the declarants had self-identified to one another as gang members.

13

*Id.* at 689-90. The Fort Worth court concluded that the statements at issue were not testimonial because they did not accuse Cantu of anything for which he might be prosecuted. *Id.* at 691. We need not determine whether the statements made by Raney to the police regarding gang membership were testimonial, however, because, assuming without deciding that Raney's statement regarding gang membership was testimonial, we find no harm resulted from its admission.

We first note that Raney's self-admission was not the only evidence of Raney's or Smith's gang membership. *See Render v. State*, 347 S.W.3d 905, 918-20 (Tex. App.—Eastland 2011, pet. ref'd) (admission of accomplice's out-of-court statement was not harmful because it was cumulative of and corroborated by other evidence). Deputy Jones testified that Raney had tattoos consistent with gang membership and photos from Raney's Facebook page showed Raney wearing gang colors and displaying gang hand signs. In addition, evidence independent of Raney's self-admission suggested Smith's gang membership, including Smith's own tattoos and his Facebook photos in which he was wearing Bloods' colors and displaying Bloods' hand signs. Jones testified that Smith was arrested for a gang-related offense—jugging—and that Smith is from a "documented gang area[]" in Houston. *See* Tex. Code Crim. Proc. Ann. art. 61.02(c)(2) (West Supp. 2017) (listing criteria for identifying an individual as a member of a criminal street gang). In addition, S.F.

14

testified that she encountered Smith's vehicle in the Walgreens parking lot parked at an odd angle, that she observed the break-in of K.V.'s vehicle, and that she followed Smith's vehicle until it crashed several miles away. Trooper Wilson testified that the victim's purse was found in the wrecked vehicle.

On the record before us, we are persuaded to a level of confidence beyond a reasonable doubt that any error in admitting Raney's self-admission of gang affiliation did not move the jury from a state of non-persuasion to a state of persuasion on any material issue in the case, nor did it contribute to the jury's determination that Smith was guilty of engaging in organized crime. *See* Tex. R. App. P. 44.2(a); *Snowden*, 353 S.W.3d at 825. We overrule issue one.

Authentication of Surveillance Video

In his second issue, Smith argues that the trial court erred in admitting the first fifty minutes of the Walgreens' surveillance video without proper authentication. According to Smith, the video was not properly authenticated because the State did not offer testimony of the store manager that the video equipment was in working order at the time the recording was made. Smith argues that the testimony of Deputy Bird was not adequate to authenticate the surveillance video because such testimony did not authenticate the system used to record the video.

To authenticate an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it to be. Tex. R. Evid. 901(a). "The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). The evidence may be authenticated by direct or circumstantial evidence. *See Butler v. State*, 459 S.W.3d 595, 602 (Tex. Crim. App. 2015) (citing *Wallace v. State*, 782 S.W.2d 854, 858 (Tex. Crim. App. 1989)). "In ruling on the admission or exclusion of photographic evidence, the trial court is accorded considerable discretion." *Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988). "The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified." *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

Rule 901(b) provides a nonexclusive list of methods to authenticate evidence. *See* Tex. R. Evid. 901(b). One method of authentication is the testimony of a witness with knowledge that a matter is what it is claimed to be. *Id.* 901(b)(1). When a photograph or video is authenticated by a witness with knowledge, the admissibility of the item is conditioned on the witness's identification of the exhibit as a fair and

16

accurate depiction of the person, place, or event that the item purports to portray. *Id.*; *Kelley v. State*, 22 S.W.3d 642, 644 (Tex. App.—Waco 2000, pet. ref'd); *Davis v. State*, 687 S.W.2d 78, 81 (Tex. App.—Dallas 1985, pet. ref'd) (citing *Goss v. State*, 549 S.W.2d 404, 406 (Tex. Crim. App. 1978); *Haas v. State*, 498 S.W.2d 206, 211 (Tex. Crim. App. 1973)). Video recordings or motion pictures sought to be used in evidence are treated like photographs. *See Huffman*, 746 S.W.2d at 222; *Williams v. State*, 461 S.W.2d 614, 616 (Tex. Crim. App. 1970) (citing Ray E. Moses, *Scientific Proof in Criminal Cases: A Texas Lawyer's Guide*, § 10.04 (1969)).

Smith argues the video was inadmissible because it was not properly authenticated, and he relies primarily upon *Fowler v. State*, 517 S.W.3d 167 (Tex. App.—Texarkana 2017, pet. granted). In *Fowler*, the Texarkana Court of Appeals held that the trial court erred in admitting a copy of a surveillance video because it was improperly authenticated where no testimony was offered concerning whether the recording equipment had been working properly. *Id.* at 170-74. We find *Fowler* distinguishable from the facts in the case at bar. In *Fowler*, there was no witness testimony or evidence presented that the original video recording accurately portrayed what the State maintained it depicted. *Id.* at 172-73 ("[T]here was no evidence presented that the video recording copied by [the officer] accurately portrayed any relevant information."). Unlike the facts in *Fowler*, in the case at bar,

17

two witnesses, Deputy Bird as well as S.F., testified that the surveillance video accurately depicted the Walgreens property, and S.F. testified that it accurately portrayed what she saw during the incident in question. Additionally, Deputy Bird testified that he met with the Walgreens manager in an office in the store where the manager accessed the security system and pulled up the video recording. Bird explained that he observed the video and obtained a copy from the store manager, and he understood that the recording system was functioning properly. Bird agreed that, based on his knowledge of the Walgreens parking lot and what he observed, the video recording accurately reflected the Walgreens parking lot. Bird testified that he arrived at the Walgreens store on the day of the offense and he retrieved the video from the manager at the store that day after he had observed the recording of the offense from the recording equipment. Bird and S.F. both testified that the surveillance video depicted the Walgreens property, and approximately twenty minutes of the video was published to the jury.

Despite a lack of testimony concerning the particular equipment used to create the surveillance video, Bird and S.F. testified from personal knowledge that the area depicted in the recording accurately depicted the place and events in question on the day of the offense. Furthermore, the circumstances under which the recording was obtained supported its authenticity. *See Angleton v. State*, 971 S.W.2d 65, 68 (Tex.

18

Crim. App. 1998). On the record before us, we conclude that the trial court did not err in admitting the surveillance video because the ultimate fact-finder could rationally have believed the sponsoring witnesses' testimony that the video was what its proponent claimed. *See Butler*, 459 S.W.3d at 605. Because we find no error in admitting the video recording, we need not conduct a harm analysis. *See* Tex. R. App. P. 47.1; *Morales v. State*, 32 S.W.3d 862, 866 n.7 (Tex. Crim. App. 2000).

### Jury Charge and Effective Assistance of Counsel

In his third issue, Smith argues that his attorney was ineffective for failing to object to the jury charge because the charge allegedly did not properly instruct the jury as to a lesser-included offense. According to Smith, "through what appears to be a clerical error, the trial court instructed the jury to find Appellant guilty as charged in the indictment (for Engaging [in Organized Criminal Activity]) if it found that the State proved the elements of Burglary of a Vehicle beyond a reasonable doubt."[2] Smith also argues that his attorney was ineffective for failing to request an instruction on accomplice testimony.

---

[2] The paragraph of the jury charge relating to Appellant's issue on appeal reads as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about [] October 6, 2016, in Montgomery County, Texas, the defendant, TRENARD JERMAINE SMITH, either acting alone or with SHAWN ANTHONY RANEY as a party to the offense, did then and there unlawfully, with intent to commit theft, break into or enter a

To the extent Smith's third issue also asserts that the trial court erred in failing to include instructions on a lesser-included offense or accomplice witness testimony, Smith has failed to adequately brief this point. *See* Tex. R. App. P. 38.1(h), (i); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (overruling issue on appeal where appellant's briefing was inadequate for neglecting to present argument and authority); *McFarland v. State*, 928 S.W.2d 482, 509 n.25 (Tex. Crim. App. 1996) (an inadequately briefed point of error presents nothing for review on appeal); *Reeves v. State*, 465 S.W.2d 757, 757 (Tex. Crim. App. 1971) (failure to brief constitutes waiver).

With respect to his other complaint, to establish that there was an ineffective assistance of counsel, a defendant must establish that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that the result of the proceeding would have been different but for the attorney's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). An allegation of ineffectiveness will be sustained only if it is firmly founded in the record and if the record affirmatively demonstrates the alleged

---

vehicle owned by [K.V.], a person having a greater right to possession of the vehicle than the defendant, without the effective consent of [K.V.], namely, without any consent of any kind, then you will find the defendant guilty as charged in the indictment.

20

ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley*, 983 S.W.2d 249). The bare record on direct appeal is usually insufficient to demonstrate that "counsel's representation was so deficient and so lacking in tactical or strategic decision[-]making as to overcome the presumption that counsel's conduct was reasonable and professional." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (citation omitted). On a silent record, the reviewing court may conclude counsel's performance was deficient only if the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone*, 77 S.W.3d at 833.

On this record, we conclude that Smith has failed to defeat the strong presumption that counsel's decisions during trial fell within the wide range of reasonable professional assistance. *See Bone*, 77 S.W.3d at 833; *Thompson*, 9 S.W.3d at 813. Nothing in the record before us demonstrates that trial counsel's performance was the product of an unreasoned or unreasonable trial strategy, or that

21

counsel's performance led to an unreliable verdict or punishment. *See Bone*, 77 S.W.3d at 834. The record before us is insufficient to establish that, but for the complained-of errors, the result of Smith's trial would have been different. *See id.* at 833. Accordingly, Smith cannot defeat the presumption that trial counsel's assistance was reasonable and professional. *See id.*; *see also Thompson*, 9 S.W.3d at 814. We overrule issue three.

## Reformation of Judgment

We note that the section of the judgment entitled "Statute for Offense[]" recites "71302" whereas Smith's information indicates he was charged under section 71.02 of the Texas Penal Code. *See* Tex. Penal Code Ann. § 71.02. The jury charge also indicates he was tried for an offense under section 71.02 of the Texas Penal Code. This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993). We therefore reform the judgment to delete the reference to "71302" and to add a citation to "71.02" of the Texas Penal Code to that section of the judgment stating the statutory reference for the offense.

Having overruled Appellant's issues, we affirm the judgment of the trial court as reformed.

AFFIRMED AS REFORMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 21, 2018
Opinion Delivered March 14, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.