# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00744-CR

**Marios Michael Lamnissos, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY
### NO. C-1-CR-23-400444, THE HONORABLE MICHAEL KEASLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Marios Michael Lamnissos guilty of assault causing bodily injury with family violence and assessed his sentence at one year in jail and a $4,000 fine. *See* Tex. Penal Code § 22.01. The jury recommended that both punishments be probated. The trial court probated the sentence and all but one dollar of the fine and placed Appellant on community supervision for two years.

Appellant contends that the trial court erred by: illegally revoking his right to self-representation mid-trial, denying him a continuance after appointing standby counsel as trial counsel in the middle of a cross-examination, excluding surveillance-video evidence that impeached the complainant, and restricting his cross-examination of the complainant.

We will affirm the judgment of conviction.

# BACKGROUND

Ana[1] testified that she met Appellant in Syria in 2016. She testified that he raped her and that, consistent with her culture's norms, she had to marry him. She had a child by him in December 2016. She and the child eventually joined Appellant in the United States to seek better opportunities to treat their son's neurological condition. Ana testified that the relationship was bad and that Appellant controlled her. She left the United States and obtained a divorce in Syria in 2021 but, at Appellant's request, returned to the United States to care for their child. She moved into Appellant's apartment on May 7, 2022. She said that Appellant denied her a phone or contact with anyone and kept her documents, including a green card, passport, Syrian identification, and birth certificate. She said that Appellant repeatedly threatened to have her deported.

Ana testified that on May 11, 2022, her birthday, she woke early to have a cup of coffee before preparing her son's breakfast and school lunch. She said that Appellant came into the kitchen singing a derogatory song. She asked him to stop. Then, she said, he began questioning her about past relationships with men and whether she was a prostitute. Ana said she responded by asking if that was what his mother and sister had done. Ana said Appellant then pushed her to the floor, sat on her, and choked her for fifteen to thirty seconds. She said that it hurt and that she was losing vision. She thought she was going to die. Ana said that Appellant stopped choking her, and that she ran to the balcony. She said she called no one because she had no phone and worried for her son.

Appellant denied choking Ana. He said that he has a bad back and that his left hand is at least 60% disabled; he said he cannot grasp things with his left hand unless he moves

---

[1] "Ana" is a pseudonym.

the left fingers using his right hand.  He agreed that Ana was in the kitchen on the morning of May 11, 2022, and that he came into the kitchen singing what he described as a joking, loving song.  He said that she did not like the song but was not mad.  He testified that he stopped singing, hugged her, and wished her a happy birthday.  Appellant testified that they had a conversation that left him "no hope" about their relationship.  He said he had with him a new phone he planned to give her as a birthday present but, after their conversation, he did not give it to her.  Maintenance workers came that afternoon to fix the dishwasher, but he testified that Ana did not like to socialize and had no interaction with the apartment staff.

The maintenance supervisor testified that she had been told not to talk to Ana because Ana did not speak or understand English.  The supervisor testified that she saw Ana, who had fear in her eyes and looked like she had been crying.  The supervisor said she saw two marks on Ana's neck that looked like fingerprints.  The supervisor testified that she recognized the marks because she, too, had been abused.  The supervisor testified that she saw cameras in the apartment.

Appellant testified that he installed cameras in the apartment in August 2022.  He put cameras in the living room, bedrooms, and outside their son's bathroom.  He testified that they were there to document and protect him and his son because Ana had assaulted him.  Ana said that Appellant accused her of allowing their son to touch her private areas, which Ana denied.  Appellant testified, "I wasn't quite sure whether [Ana] was a sick person who really needs help or if she was an evil person."

The maintenance supervisor testified that Ana came to her office on August 26, 2022, and gave her a note that said, "If anything happens to me, can you please call these numbers?"  Ana testified that Appellant had threatened to buy some land and bury her there and

3

told her that nobody here knew about her except for his daughter and son-in-law. She said she went back to the apartment because she had nowhere to go and was concerned for her son. Ana testified that she and Appellant argued the next day and that she walked out of the apartment; Appellant told her if she left, she could not come back. She had no phone or money and was in "home clothes." He had changed the apartment lock key code but allowed her in to get clothes and her purse. Ana went to the supervisor's apartment. The supervisor described Ana as crying, frantic, shaking, and saying, "He's going to kill me." Ana did not want to call the police because she was concerned for her son and also concerned that Appellant would have her deported; she said she did not know that her immigration status was such that he could not do so. Ana was persuaded to call the police. She spent four hours at the supervisor's apartment with law enforcement and a counselor but then returned to the apartment. On August 31, 2022, Ana moved to a shelter with their son, and Appellant started the process to evict her.

Travis County Sheriff's Office Detective Robert Dillard interviewed Appellant more than once. He said that Appellant tried to direct or redirect the conversation. Appellant said he was trying to evict Ana, then that the apartment complex was trying to evict her, and then that he did not know what the apartment management meant by "getting evicted." Dillard testified that Appellant first denied saying that he would bury Ana, then Appellant said that "I'll bury you" is an Arabic term of endearment and expression of love; when asked if "I'll bury you" means "I'll kill you," Appellant said "yes." Dillard conceded on cross-examination that he did not investigate whether "I'll bury you" is an idiomatic expression like "I love you to death" is in English. Dillard said Appellant denied refusing Ana access to a phone, friends, money, or a car, and said that he disallowed social media so Ana would not get bad information on potty training. The child was at least five years old. Though Appellant said he had the video recordings so he

4

could "make his case," Dillard received no video from Appellant; Dillard did not ask for footage from Appellant. Dillard described this as a "very fearful" case. He concluded that there was probable cause to believe that Appellant assaulted Ana.

**DISCUSSION**

Appellant raises four issues on appeal—two concerning the revocation of his self-representation and two concerning the exclusion of evidence. Because the limitation of Appellant's cross-examination and the revocation of his right to self-representation are closely related factually and procedurally, we will review them together first.

**I.     The trial court did not abuse its discretion by limiting Appellant's cross-examination or revoking his right to self-representation mid-trial.**

Appellant complains that the trial court improperly prevented him from developing his defense that Ana was not credible and had the improper motive of securing sole custody of their child, avoiding eviction, and leveraging the family violence charge "for immigration relief or divorce advantage." The trial court's limits and Appellant's struggle against those limits led the court to revoke Appellant's right to self-representation. He contends that the trial court erroneously revoked his right to self-representation mid-trial without adequate warnings, findings, or justification. The court did so in the middle of Appellant's cross-examination of Ana after numerous directives to focus his questions on events relevant to the May 2022 assault rather than events in previous years.

**A.  Standards of review**

Defendants have the right to confront and cross-examine witnesses by attacking a witness's credibility or showing possible bias, self-interest, or motives in testifying. *See*

U.S. Const. amend. VI; *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). The trial court's discretion to control the flow of proceedings does not allow it to prohibit inquiries that might provide a reasonable jury a significantly different impression of the witness's credibility. *See Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014). In the prosecution of an offense committed against a member of the defendant's household,

> each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.

Tex. Code Crim. Proc. art. 38.371(b).

Nevertheless, trial courts retain wide latitude under the Confrontation Clause to impose reasonable limits on cross-examination so long as they do not infringe on the guarantee of an opportunity for effective cross-examination. *Johnson*, 433 S.W.3d. at 551-52; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude" under the Confrontation Clause to impose restrictions on cross-examination based on such criteria as "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."). While witnesses can be cross-examined on any relevant matter, including credibility, courts are to exercise reasonable control over examinations to make them effective for determining the truth, avoid wasting time, and protect witnesses from harassment or undue embarrassment. Tex. R. Evid. 611(a), (b). We review limitations to cross-examinations for an abuse of discretion. *See Irsan v. State*, 708 S.W.3d 584, 621 (Tex. Crim. App. 2025). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.*

Evidence must be relevant to be admissible and even relevant evidence can be excluded if its probative value is substantially outweighed by the danger of confusing the issues, undue delay, or needlessly presenting cumulative evidence. *See id.* R. 401-403; *see Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). The Court of Criminal Appeals opined that evidence that consumes an inordinate amount of time to present or answer might tend to confuse or distract the jury from the main issues and that undue delay and needless presentation of cumulative evidence concerned the efficiency of the trial proceeding. *Gigliobianco*, 210 S.W.3d at 641. The trial court's determination regarding admissibility of evidence is reviewed under an abuse of discretion standard. *See Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016)

A criminal defendant has a constitutional right to conduct his own defense. *Faretta v. California*, 422 U.S. 806, 819 (1975). The Sixth Amendment guarantees a criminal defendant the right "personally to decide whether in his particular case counsel is to his advantage" even if his choice is ultimately to his own detriment. *Id*. at 834. The defendant's self-representation must respect the "dignity of the courtroom." *Id*. n. 46. "The government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000) (declining to extend *Faretta* to appellate proceedings). Therefore, trial courts are afforded the discretion to deny self-representation by a defendant who "deliberately engages in serious and obstructionist misconduct" or "abuse[s] the dignity of the courtroom." *Faretta*, 422 U.S. at 834 n.46. Because the trial court's decision to deny self-representation based on deliberately obstructive behavior turns on an evaluation of

credibility and demeanor, we afford almost total deference to that decision. *See Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010).

## B. Appellant's arguments

Appellant argues that, by barring questions on motive and credibility, the court left the jury with a sterilized version of Ana. He complains that he was not allowed to explore whether a protective order or police involvement aided Ana's immigration status, prior false or inconsistent statements in civil or immigration proceedings, evidence that she had previously threatened him or fabricated claims in other jurisdictions, and her prior access to legal advice, including her divorce attorneys. Appellant argues that this limitation of his inquiry into Ana's credibility violated his right to confront and cross-examine witnesses by attacking her credibility or showing possible bias, self-interest, or motives in testifying. *See* U.S. Const. amend VI; *Hammer*, 296 S.W.3d at 561. He contends that the trial court's discretion does not allow it to prohibit inquiries that might provide a reasonable jury a significantly different impression of the witness's credibility. *See Johnson*, 433 S.W.3d at 551. Appellant argues that his prohibited queries sought relevant and admissible evidence relating to the bias and credibility of the witness as well as the nature of the relationship between Appellant and Ana.

Appellant contends that the court's frustration with argumentative and repetitive questions did not support denial of his right to represent himself. He argues that his actions were not so disruptive that they threatened the integrity of the trial. *See Indiana v. Edwards,* 554 U.S. 164, 177 (2008).

## C. The record

Our review of the record shows Appellant inquiring into the history of his relationship with Ana and the trial court urging him to move on to events relating to the May 11 assault. When Appellant asked Ana about what caused her to marry him, and she responded that it was because he raped her, Appellant objected to Ana "going on a tangent." The State objected to the relevance of the line of questioning, and the court sustained the State's objection and directed Appellant to "[m]ove along to something that pertains to the offense which we are discussing here." Appellant's next question was, "So you got married to the defendant on that date you mentioned: is that correct? March?" The court directed him to ask a new question. Appellant asked how long he stayed with her after their marriage in Syria, then about when she told him about her pregnancy and his reaction. The court again directed Appellant to "move along to something that relates to the offense for which we are here."

Appellant asked Ana about her move to Cyprus, correcting her answer of "Cyprus, Greece" by asserting that "Cyprus and Greece are two separate countries." When the court again urged Appellant to "get to things that are relevant to this particular case, please, sir," Appellant responded, "Everything is relevant, Your Honor." Appellant then asked why he moved her to Cyprus. He also asked Ana about their child's birth date; when she answered, Appellant repeated her answer, and the court urged him not to repeat answers and questioned what the child's birth date had "to do with here." When the court again urged him to "[a]sk questions that have to do with the offense for which we are here," Appellant said, "I have a defense theory, and every single thing I'm asking about has relevance to this case." The court then said:

9

I'm not going into a lifetime. According to you, I guess every event that took place in this woman's life or in the child's life is relevant. It's not. We are going to deal with this case, and I don't want any more arguing from you. Maybe you might confer with your standby counsel, but I don't have the time to conduct a law school class for you. So you need to talk about the case—something that has to do with the event for which you stand charged. I don't plan on being here six years while you go over every detail. You understand?

Appellant said he did, then asked Ana why he moved her to the United Kingdom. The court then excused the jury.

The court had the reporter read back Appellant's last question concerning whether he moved Ana to the United Kingdom because his sister lived there, then asked, "Now, what in the name and the [S]am [H]ill does that have to do with the offense you're charged with here? The fact that you moved her to the United Kingdom for something to do with your sister? What does that have to do with this case?" Appellant replied that he was laying the foundation for Ana's stabbing him, which the State asserted was part of Appellant's granted motion in limine to keep out extraneous offenses. The court agreed that the motion applied to everybody's extraneous offenses and asked, "[A]re you saying that if she did try to stab you back in—years ago, that this somehow justifies your choking her?" Appellant replied, "No, Your Honor. Absolutely not." The court replied, "Well it must. Because otherwise it has no relevance." After another exchange in which Appellant asserted that the State had brought in extraneous offenses, the court said, "They have brought evidence of that particular offense and the facts and circumstances surrounding it. I am not going to allow stuff back years and years and years like this. Don't do it again."

After a five-minute recess, Appellant's first question was, "[Ana], when did you come back from the United Kingdom—." The court interrupted, "Oh, no, no, no, no, no. We are

10

not going back—[Appellant interjected "just the dates, Your Honor"]. Excuse me. We are not going back to the United Kingdom again. We are going back to more modern times. We are not going to go back over the past six years." Appellant then began to question Ana about when she learned of her residency status, including back in Cyprus, prompting the court to again excuse the jury. The court said, "If you go back to Cyprus or anything other than something relating to the offense, the time of the offense—you do it one more time, you're in contempt of this Court." The court later specified, "I don't want anything other than something that happened—let's say as early as 2021, something like that." Appellant later said, "I would like the record to show my strong objections to Your Honor's intimidation to me and to Your Honor preventing me from presenting my defense and I would like that clear on the record."

When trial resumed, Appellant asked Ana to clarify whether she had said that she arrived in the United States with no idea about her green card. She said she did not know of her status but received a visa. She said she knew that Appellant got a green card but denied knowing anything about it. After an exchange in which the trial court tried to clarify the questions and answers, Ana said, "I did not know about my status here. Never. And he kept the green card, all my documents." The court then said, "Okay. That's all we will have to do with the green card." But shortly thereafter, Appellant approached the bench to assert, "[T]he green card is extremely important. It is an article of every single accusation, including the accusation that the State just made right now in their question. Because it proves control, Your Honor."[2] The court stated that Ana had answered that she did not see the green card or know her status at least twice. "No

---

[2] It is unclear what "question" Appellant meant, as he was cross-examining Ana, and the State had not spoken except to object.

more," the court cautioned. Yet Appellant tried to return to the green card a few minutes later. "No more about the green card," the court stated. Eventually, the court excused the jury again.

After some discussion about allowable inquiry, Appellant asked, "What is not allowed, Your Honor?" The court replied:

> What is allowed is anything—these allegations? That you have cameras up all over the place? That you strangled her? You can ask questions about those, certainly. And things directly relevant to that. But what's alleged in the Indictment, you—in the Information, you have testimony here about three or four different dates. We're not going to go into all the dates that take place in between. We're not going back over—you have been on the green card for almost half an hour. Things to do with the green card, we are not going to touch that anymore. You will deal with the facts and circumstances surrounding this case or you are going to be held in contempt and spend the night in jail.

Appellant then reurged his "objection to Your Honor['s] intimidation. I'm not going to be scared of going to jail. I'm going to defend myself. This is the core of my case." The court then cautioned Appellant that he risked losing the right to defend himself by abusing it. "And if you can't follow the rules, I can get your standby counsel to ask questions the way they should be asked on cross-examination of a witness in a criminal case." The court added:

> Because I'm not going to have this case drag on and on and on. We've already been—this witness has been on the stand probably over an hour now—well over an hour, and what took maybe 15 minutes on direct. You're just not going to do that. You're not going to go on at great length about everything that happened between here and Syria and Cyprus and when you first came there and then living with your daughter and all the rest of that stuff. We're not going to do that.
>
> We are dealing with an offense alleged here having to do with family violence that you are charged with: One specific act and one Information. And that's what's going to be dealt with here, and if you're not—you're obviously not in the mood to deal with it or you're going to go all over the place, all around it and everything that's happened for years and years and years having to do with green cards and everything else that are just not relevant here.

12

So we're going to move on from there now. You will have a chance to cross-examine this witness on the facts that are alleged in that Information. And the first time you steer from it, I'm going to remove you from the courtroom, have you in a different room and have your standby lawyer do it for you. Because you will have, by your actions, given up your right to represent yourself. Now I hope that's clear.

Appellant responded:

For the third time, I would like the record to urge my strong objection to Your Honor intimidating me, threatening me and interfering with my right to defend myself. You're dictating, Your Honor, how I should conduct my defense. You're dictating what question I need to ask. I am simply putting foundation to the exact event.

Appellant offered to give a small example of why it was related, but the court declined, saying that it had given Appellant some leeway to go back to Syria and her pregnancy "and all this business that have absolutely nothing to do with the offense that's alleged here. . . . I'm just trying to keep you within the rules . . . ."

Appellant added, "I'd also like the record to show, Your Honor, my strong objection to appointing the counsel as you're threatening. Because the counsel, while he was present in the room, he does not have a clue about this case." The court disagreed, noting that standby counsel had been on the case for "quite some time." Standby counsel Michael Watson stated in court that he was appointed on August 22, 2024, but later in a written motion stated he was appointed in May 2024 ahead of the November 2024 trial.

When trial resumed, Appellant asked Ana whether she engaged in lewd behavior with their child at his daughter's house and why he installed the cameras there. He then asked her when the child was diagnosed with autism and asserted at a bench conference that he would explain what the child's autism had to do with the charge that Appellant assaulted Ana. The

13

court said that Appellant could explain when he testified but could not get information about why he installed the cameras through Ana. Appellant then asked why Ana came back to the United States sometime in 2020 or 2021, and she answered that she thought it had something to do with a green card. The following exchange occurred:

Q. Okay. So it is your statement that you have no idea why the defendant, after one month, went over there and brought you back again?

A. Uh-huh.

Q. Okay. Fair enough. Where did you stay during—how long did you stay first?

A. Two weeks.

Q. Two weeks. And where did you stay?

A. In the hotel.

Q. I'm sorry?

A. Hotel.

Q. Hotel?

A. Uh-huh.

Q. Fair enough. When asked about this particular event at length and "Where did you stay?" previously under oath in the courtroom in your Protective Order case, do you recall saying that you stayed in 5500—

[The State]: Your Honor, I object. Relevance.

The court sustained the objection and excused the jury. The court noted that the witness had been on the stand for over two hours, then stated, "You have forfeited your right to represent yourself." The court appointed Watson to represent Appellant. Though the court considered jailing Appellant for contempt and isolating him in an adjacent room with the sound of the trial

14

provided, the court opted not to jail him and to allow him to sit at counsel table. Appellant then requested that the judge recuse himself and declare a mistrial.

After the motion to recuse was denied and the motions for mistrial and continuance were denied, Watson further cross-examined Ana.

### D. Cross-examination limitations

Appellant has not shown that the trial court abused its discretion by limiting his cross-examination of Ana. We note first that Appellant's argument that the State's case hinged solely on Ana's credibility is inaccurate. While there was no eyewitness to the May 11 incident other than Ana and Appellant and, according to Appellant, his surveillance cameras were not installed, the maintenance supervisor testified that she saw Ana a few hours after the incident and that the marks on Ana's neck indicated abuse; she also described Ana as fearful and looking as if she had been crying.

Further, the trial court did not abuse its discretion by finding Appellant's examination repetitive and concluding that he had not shown the relevance between the subjects he was restricted from inquiring about and Ana's credibility or the elements of the offense. The court repeatedly explained what it deemed relevant and increasingly strongly warned Appellant about the consequences of his inability to confine his inquiries to subjects and time periods deemed relevant by the trial court. Appellant's appointed counsel was allowed to further cross-examine Ana after he was appointed. The court's limitation of Appellant's cross-examination did not sweep so broadly as to render the examination wholly ineffective and did not reach constitutional dimension. *See Johnson*, 433 S.W.3d at 557. We conclude that the

trial court did not abuse its discretion by limiting Appellant's cross-examination and that the limitation did not violate the Confrontation Clause. *See Irsan*, 708 S.W.3d at 621.

### E. Revocation of self-representation

Appellant chose to represent himself in February 2024. Watson was appointed to serve as standby counsel in May 2024. There is no dispute that Appellant decided competently, knowingly, intelligently, and voluntarily to represent himself. *See Godinez v. Moran*, 509 U.S. 389, 400-01 (1993); *see also Faretta*, 422 U.S. at 834-36. The question is whether the trial court abused its discretion by determining that Appellant's actions reached the level of deliberately engaging in serious and obstructionist misconduct. *See Faretta*, 422 U.S. at 834 n.46.

We conclude that the trial court did not abuse its discretion. The court repeatedly instructed Appellant to focus on relevant issues, then expressly defined what would be relevant inquiries. Appellant strayed back into those areas repeatedly. The court noted that the repetitive examination of Ana on topics the court deemed irrelevant had taken much longer than the direct examination had. The court did not abuse its discretion by concluding that Appellant's repetitive actions constituted deliberate engagement in serious and obstructionist misconduct. *See id.*

## II. The trial court did not abuse its discretion by denying the motion for continuance after appointing trial counsel mid-cross-examination.

Upon the revocation of Appellant's right of self-representation, Appellant's newly-appointed counsel requested a continuance. The trial court adjourned for the evening, and counsel said he would be ready in the morning. After a hearing and denial of Appellant's motion to recuse the trial judge, Appellant filed a written motion for continuance. Counsel wrote that, though he had been Appellant's standby counsel since May 2024, he had been instructed not to

16

try the case but to be a resource for Appellant. He had had jury trials the two weeks before this trial but did not object to this trial date because he was not responsible for trial preparation. Though he had said the previous afternoon he would be ready, Watson then asserted that he "would be ineffective to proceed."

We review the trial court's denial of a motion for continuance for an abuse of discretion. *Ross v. State*, 133 S.W.3d 618, 629 (Tex. Crim. App. 2004). A continuance can be granted for "sufficient cause shown." Tex. Code Crim. Proc. art. 29.03. The rules permit a mid-trial continuance:

> A continuance or postponement may be granted on the motion of the State or defendant after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had.

*Id*. art. 29.13. The right to counsel of choice is balanced with the trial court's need for prompt and efficient administration of justice; considerations can include whether counsel was prepared to try the case, the convenience or inconvenience of witnesses, and the complexity of the case. *See generally Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982) (denying habeas writ and finding no abuse of discretion from denial of continuance when defendant failed to secure counsel of choice but trial proceeded with prepared appointed counsel).

Appellant argues that actual prejudice shows an abuse of discretion. *See Ward v. State*, 427 S.W.2d 876, 881 (Tex. Crim. App. 1968). Examples of such prejudice include unfair surprise, the inability to effectively cross-examine witnesses, and the inability to adduce crucial testimony from potential witnesses. *See Tanguma v. State*, 47 S.W.3d 663, 680 (Tex. App.—Corpus Christi–Edinburg 2001, pet. ref'd). Appellant asserts that Watson had no

opportunity to review the State's evidence, to review Appellant's evidence or to interview his witnesses, or to prepare for cross-examining key witnesses. He points to Watson's lack of objections during the State's punishment arguments. Appellant urges that Watson's lack of preparation as lead counsel caused him to be ineffective in cross-examination and unable to adduce crucial testimony from potential witnesses.

When denying the motion for continuance, the court stated that the jury had been waiting and inconvenienced. The court did not want the witnesses to have to return for a third time. The court said that some witnesses had come at great inconvenience, including one whose grandchild was undergoing surgery. Watson said he urged the motion only for the interests of justice and offered a mistrial as an alternative. The court stated that Watson had been appointed standby counsel "some time ago" before that judge had taken over the case. The court noted that Ana, according to her testimony, had experienced trauma and then had been "harassed" for an hour and a half on the stand; the court did not want to put her through that again. The court stated that, from what it had seen of Watson's performance, it had the utmost confidence in Watson's ability to represent Appellant within the bounds of effective and excellent representation.

Appellant did not create a record of how the continuance's denial impacted the witnesses called, evidence offered, or questions asked by Watson, much less show that the denial prejudiced Appellant or affected his substantial rights. *See* Tex. R. App. P. 44.2(b). We conclude that Appellant has not shown that the trial court abused its discretion when denying the motion for continuance. Watson was present for pretrial proceedings, voir dire, and the trial through the cross-examination of Ana. The court had seen Watson's length of involvement as standby counsel and his performance in that role. The court balanced the benefit of counsel's additional

preparation time against the toll of further delay on the jury and witnesses including Ana, who would be awaiting further cross-examination during the continuance—or a complete re-examination if a mistrial were declared. We find no abuse of discretion presented. *See Ross*, 133 S.W.3d at 629.

### III. Appellant has not shown that the trial court violated his right to present a complete defense by excluding surveillance video evidence that he contends directly impeached Ana.

Appellant sought to introduce a video exhibit that was a compilation of shots from his surveillance cameras on August 27, 2022. He sought to authenticate it while cross-examining Ana. He contends that its exclusion was an abuse of discretion and deprived him of his constitutional right to present a defense.

To preserve a claim that the exclusion of evidence deprived a defendant of the constitutional right to present a defense, the defendant must effectively communicate to the trial court that the complained-of ruling denied that right. *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018). Because we do not find where Appellant preserved his constitutional complaint regarding the exclusion of the video, we will review for non-constitutional error in its exclusion.

We review the trial court's ruling on authenticating an exhibit for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.* "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). That can be done by testimony of a witness with knowledge that an item is what it

is claimed to be. *Id*. R. 901(b)(1). A person who was at the scene shown in a video can authenticate the video by testifying that the video is an accurate representation of the scene in question. *See Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988). Factors in authentication can include testimony that the tape did not contain additions, deletions or changes and that the tape clearly and accurately depicts the events during the video taping of appellant. *See Delgado v. State*, 691 S.W.2d 722, 724 (Tex. App.—San Antonio 1985, no pet.). A videotape that is a "jumbled mess" can nevertheless be authenticated by a witness who testifies that the camera recorded exactly what happened. *Hines v. State*, 383 S.W.3d 615, 624 (Tex. App.—San Antonio 2012, pet. ref'd).

Appellant argues that he sought to introduce the video to show Ana singing, whistling, and appearing calm on August 27, 2022, before her outcry. The video was apparently compiled from different cameras in the apartment. When asked if it was a true and accurate video of what happened on August 27, 2022, she responded, "I think so." She agreed that the video showed the apartment as it was on August 27 and her singing, though she attributed the whistling to a parrot. But she also testified that "[t]he situation is not like the video." The court was not clear on the chronological sequence of images; Ana testified that a segment that showed Appellant and their son leaving the apartment was from earlier in the day. Ana testified that she did not know whether the video was altered "because I don't understand that." She said that Appellant is a computer engineer and could have altered the video. She testified she had no idea if it was altered.

The State objected that the video was a compilation, that the authenticating witness could not verify that it was not altered, and that even if the video showed her state of mind in August, that was not relevant to her state of mind on the date of the charged offense in

20

May. The court concluded that the video had not been sufficiently authenticated by Ana's testimony because of the unexplained edits. The court instead admitted some still pictures taken from the video that showed the apartment.

We conclude that the trial court did not abuse its discretion by finding that Ana's testimony did not sufficiently authenticate the video. Her concerns about the potential manipulation of the time of the video mean that the court's decision that she had not testified that the video was an accurate representation of the scene was within the zone of reasonable disagreement. *See Huffman*, 746 S.W.2d at 222 (holding that authentication turns on testimony that the video accurately reflects the scene); *Delgado*, 691 S.W.2d at 724 (holding that video images can be authenticated in part by testimony that recording had no deletions from original).

Even if the trial court erred, we conclude that the error was harmless. Exclusion of evidence presents reversible error only when it is harmful—even when the exclusion may touch on constitutional rights. *See* Tex. R. App. P. 44.2. There are two circumstances in which the improper exclusion of evidence may establish a constitutional violation: (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense. *Ray v. State,* 178 S.W.3d 833, 835 (Tex. Crim. App. 2005). For non-constitutional errors, substantial rights are affected when the error has substantial and injurious effect or influence in determining jury's verdict. *Walters v. State,* 247 S.W.3d 204, 219 (Tex. Crim. App. 2007).

In determining whether a defendant's substantial rights were affected, the reviewing "court should consider everything in the record, including any testimony or physical

21

evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider . . . the State's theory and any defensive theories, closing arguments and even voir dire, if applicable." *Motilla*, 78 S.W.3d at 355-56. If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). The erroneous exclusion of evidence can be mitigated by the admission of other, similar evidence. *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998).

Appellant contends that the video showing Ana "calmly walking through the apartment, singing and whistling, and carrying out mundane household tasks" would have impeached her testimony about her mental state when she made her outcry. He contends that this was critical, primary evidence for which there was no evidentiary or testimonial substitute from another witness. He asserts that this erroneous exclusion violated his constitutional right to present a complete defense. But Ana admitted on cross-examination by counsel that she whistled, sang, and made faces at the camera on August 27, 2022; she testified that she did so because she was angry with Appellant because he took their son out of the apartment without her and without telling her where they were going. Any error in the exclusion of the video of Ana singing and whistling calmly was mitigated by the admission of Ana's testimony that she did so. *See Mosley*, 983 S.W.2d at 258. Further, whether Ana sang or was calm when Appellant was absent from the apartment on August 27, 2022, does not discredit testimony—from both Ana and

22

Appellant—that they later had an argument that led to him changing the lock code while she was outside the apartment. And the relevance of the recording of her behavior earlier on August 27, 2022, is greatly attenuated from the question presented the jury of whether Appellant had caused her bodily injury three months earlier on May 11, 2022; accordingly, any error in its exclusion was harmless. *Cf. Davis v.* State, 597 S.W.2d 358, 360-61 (Tex. Crim. App. 1980) (holding that when court erroneously excluded evidence that should have been allowed under optional completeness, error was harmless because excluded evidence was irrelevant).

In light of the record as a whole, we conclude that any error in the exclusion of the video evidence did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).[3]

## CONCLUSION

We affirm the judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed: August 29, 2025

Do Not Publish

---

[3] Even if Appellant preserved the constitutional complaint that the exclusion of the video deprived him of his right to present a complete defense, we would conclude beyond a reasonable doubt that the exclusion did not contribute to his conviction or punishment. *See* Tex. R. App. P. 44.2(a). The evidence of Ana's behavior before she was locked out came into the record through Appellant's counsel's cross-examination.